**In re Howard Richard VEAL, Jr., and Shelli Ayesha Veal, Debtors.**

**Howard Richard Veal, Jr.; Shelli Ayesha Veal, Appellants,**

v.

**American Home Mortgage Servicing, Inc.; Wells Fargo Bank, N.A., as Trustee for Option One Mortgage Loan Trust 2006–3 Asset–Backed Certificates, Series 2006–3, and its successor and/or assignees, Appellees.**

**BAP Nos. AZ–10–1055–MkKiJu, AZ–10–1056–MkKiJu (Related Appeals).[*] Bankruptcy No. 09–14808.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted on June 18, 2010.

Decided June 10, 2011.

---

* While not formally consolidated, these two related appeals were heard at the same time, and were considered together. This single disposition applies to both appeals, and the

clerk is directed to file a copy of this disposi- tion in each appeal.

Trucly D. Pham of John Joseph Volin, P.C., argued for Appellants Howard Richard Veal, Jr. and Shelli Ayesha Veal.

Kevin Hahn of Malcolm Cisneros argued for Appellees American Home Mortgage Servicing, Inc. and Wells Fargo Bank, N.A., as Trustee for Option One Mortgage Loan Trust 2006–3 Asset–Backed Certificates, Series 2006–3, and its successors and/or assignees.

Before: MARKELL, KIRSCHER and JURY, Bankruptcy Judges.

**OPINION**

MARKELL, Bankruptcy Judge:

**Table of Contents**

 **I. INTRODUCTION** ................................................. 902

 **II. FACTS** ......................................................... 902
 A. *AHMSI's Proof of Claim and the Veals' Claim Objection* .................... 903
 B. *Wells Fargo's Relief from Stay Motion and the Veals' Response* .............. 904
 C. *Joint Hearing on the Claim Objection and the Relief from Stay Motion* ..... 905

**III. DISCUSSION** ................................................... 906
 A. *Standing in Mortgage Cases* ...................................... 906
 1. Constitutional Standing ........................................ 906
 2. Prudential Standing ........................................... 906
 3. Prudential Standing and the Real Party in Interest Doctrine ............ 907
 4. Real Party in Interest Status and Its Policies ............. ............. 907
 B. *The Substantive Law Related to Notes Secured by Real Property* ............. 908
 1. Applicability of UCC Articles 3 and 9 ................................ 908
 2. Article 3 of the UCC and the Concept of a "Person Entitled to
 Enforce" a Note ............................................. 910

**902**

 3. Article 9 and Transfers of Ownership and Other Interests in a
 Promissory Note ................................................912
 C. *Wells Fargo's Lack of Standing to Seek Relief from the Automatic Stay*.....913
 1. Standing to Seek Relief from Automatic Stay..........................913
 2. Wells Fargo's Argument Regarding Standing .........................915
 3. Wells Fargo's Lack of a Connection to the Note ......................915
 D. *AHMSI's Lack of Standing To File Proof of Claim* .......................918
 1. The Lack of Findings on Central Issues ..............................919
 2. Analysis of the Record and AHMSI's Status as a "Person Entitled to
 Enforce" the Note .........................................920

IV. CONCLUSION ................................................922

## I. INTRODUCTION

In the first of these two related appeals, debtors and appellants Howard and Shelli Veal (the "Veals") challenge the bankruptcy court's order granting relief from the automatic stay under § 362(d)[1] to appellee Wells Fargo Bank, N.A., as Trustee for Option One Mortgage Loan Trust 2006–3, Asset–Backed Certificates Series 2006–3 ("Wells Fargo").[2] In the second appeal, the Veals challenge the bankruptcy court's order overruling their objection to a proof of claim filed by appellee American Home Mortgage Servicing, Inc. ("AHMSI"). This proof of claim relates to the same obligation that is the focus of Wells Fargo's motion for relief from the automatic stay.

In each appeal, the issue presented is whether the appellee established its standing as a real party in interest to pursue the relief it requested. With respect to Wells Fargo's request for relief from the automatic stay, we hold that a party has standing to seek relief from the automatic stay if it has a property interest in, or is entitled to enforce or pursue remedies related to, the secured obligation that forms the basis of its motion. With respect to AHMSI's proof of claim, we hold that a

party has standing to prosecute a proof of claim involving a negotiable promissory note secured by real property if, under applicable law, it is a "person entitled to enforce the note" as defined by the Uniform Commercial Code.

Applying these holdings, in the relief from stay appeal, we determine that the record does not support the bankruptcy court's finding that Wells Fargo had standing. We thus REVERSE the bankruptcy court's relief from stay order. In AHMSI's claim objection appeal, the bankruptcy court did not make findings necessary to determine AHMSI's standing as a person entitled to enforce the Veals' obligations, so we must VACATE the claim objection order and REMAND for further proceedings.

## II. FACTS

The Veals do not dispute that, in August 2006, Shelli Veal executed a promissory note (the "Note") in favor of GSF Mortgage Corporation ("GSF"). To secure her payment obligations under the Note, Ms. Veal also executed a mortgage (the "Mortgage") in favor of GSF covering certain real property located in Springfield, Illinois (the "Property").

---

**1.** Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

**2.** The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(B) and (G), and we have jurisdiction under 28 U.S.C. § 158.

On June 29, 2009, the Veals filed a chapter 13 bankruptcy. The Veals listed AHMSI on their Schedule D as a secured creditor. This schedule, submitted under penalty of perjury, stated that the Veals owed AHMSI $150,586.92 (the "Veal Loan"), and that AHMSI held security on the Property securing that indebtedness. At no point did the Veals' schedules ever list the Veal Loan as disputed. The Veals similarly referred to AHMSI as a secured creditor in their chapter 13 plan and in their amended chapter 13 plan. At the time this appeal was submitted, the Veals had not confirmed their plan.

### A. AHMSI's Proof of Claim and the Veals' Claim Objection

On July 18, 2009, AHMSI filed a proof of secured claim. In the proof of claim, AHMSI stated that it was filing the claim on behalf of Wells Fargo as Wells Fargo's servicing agent.

In addition to an itemization of the claim amounts, AHMSI attached the following documents to the proof of claim:

(1) a copy of the Note, showing an indorsement from GSF to "Option One";

(2) a copy of the Mortgage;

(3) a copy of a recorded "Assignment of Mortgage" assigning the Mortgage from GSF to Option One Mortgage Corporation ("Option One"); and

(4) a letter dated May 15, 2008, signed by Jordan D. Dorchuck as Executive Vice President and Chief Legal Officer of AHMSI, addressed to "To Whom it May Concern" (the "Dorchuck Letter").

On its face, the Dorchuck Letter states that AHMSI acquired Option One's mortgage servicing business.

The Dorchuck Letter is just that; a letter, and nothing more. Mr. Dorchuck does not declare that his statements are made under penalty of perjury, nor does the document bear any other of the traditional elements of admissible evidence. No basis was laid for authenticating or otherwise admitting the Dorchuck Letter into evidence at any of the hearings in this matter. Indeed, the Veals objected to its consideration as evidence.[3]

On November 5, 2009, the Veals filed an objection to AHMSI's proof of claim. Approximately a month later, the Veals filed a memorandum of points and authorities in support of their claim objection. Among other objections, the Veals contended that AHMSI lacked standing. According to the Veals, AHMSI needed to establish that it was authorized to act as servicing agent on behalf of Wells Fargo, and that either AHMSI or Wells Fargo had to be qualified as holders of the Note, within the meaning of Arizona's version of the Uniform Commercial Code. The Veals argued that the proof of claim exhibits did not establish any of these necessary facts.[4]

On November 19, 2009, AHMSI filed its opposition to the Veals' claim objection. The opposition contained no legal argument and virtually no evidence. Almost a page long, the opposition simply rehashed the contents of AHMSI's proof of claim. AHMSI also attached to the opposition duplicate copies of some of the same documents that it had previously attached to the proof of claim, again without any ap-

---

**3.** The Veals stated in a memorandum filed with the bankruptcy court that "[t]his [Dorchuck] letter is not admissable [sic] evidence of anything." The bankruptcy court did not rule on this objection.

**4.** The Veals also argued that there were several defects in the chain of mortgage assignments between GSF and Wells Fargo, but the Veals emphasized that the key defect was the failure to establish that either AHMSI or Wells Fargo qualified as the holder of the note.

parent compliance with the rules of evidence, as AHMSI provided no declaration authenticating any of the documents attached thereto.

### B. *Wells Fargo's Relief from Stay Motion and the Veals' Response*

Meanwhile, on October 21, 2009, Wells Fargo filed a motion for relief from stay to enable it to commence foreclosure proceedings against the Property. Wells Fargo alleged in the motion that it was a secured creditor pursuant to a first priority mortgage. None of the three exhibits attached to the motion, however, directly supported this allegation: its first exhibit was a copy of the same Mortgage that AHMSI attached to its proof of claim; its second exhibit was an itemization of postpetition amounts due; and its final exhibit was a copy of the Veals' Schedules A and D. Wells Fargo submitted no other documents with its motion. As a result, Wells Fargo presented no evidence as to who possessed the Note and no evidence regarding any property interest it held in the Note.

On November 5, 2009, the Veals responded to the relief from stay motion. They argued that Wells Fargo lacked standing to prosecute the relief from stay motion and that Wells Fargo was not the real party in interest. The Veals also submitted no evidence with their response;

rather, they relied on the absence of evidence submitted in support of the relief from stay motion.[5]

Wells Fargo did not file a written reply in support of its relief from stay motion. It did, however, file two separate papers, each entitled "Notice of Supplemental Exhibit." The first notice, filed on November 10, 2009, attached a single exhibit—a copy of the same Note that AHMSI had attached to its proof of claim. The second notice, filed on February 1, 2010, contained two exhibits: (a) a copy of the same assignment of mortgage that AHMSI had attached to its proof of claim, and (b) a copy of a subsequent assignment of mortgage, dated November 10, 2009—after the date of filing of the relief from stay motion—assigning the rights under the Mortgage from "Sand Canyon Corporation formerly known as Option One Mortgage Corporation" to Wells Fargo. Neither of these assignments were authenticated.

These assignments were important. They purported not only to transfer the Mortgage to each named assignee, but also to transfer other rights as well. The purported assignment from GSF to Option One, for example, stated that it assigned not only the Mortgage, but also "the note(s) and obligations therein described and the money due and to become due thereon with interest, and all rights accrued or to accrue under such Mortgage."[6]

---

**5.** The Veals did refer the bankruptcy court to documents available on the website of the Securities Exchange Commission supposedly related to the alleged securitization of the Veal Loan, but there is no indication in the record whether the bankruptcy court actually looked at or considered these documents.

These documents, had they been properly authenticated, might have filled some (but not all) of the gaps in the evidence. For instance, the documents contained a Pooling and Servicing Agreement ("PSA") for a securitization trust. The PSA identifies and appoints Option One as servicer for the trust assets and identifies Wells Fargo as trustee of the trust. Fur-

ther, the schedules attached to the PSA appear to identify the Veal Loan as one of the trust assets. Thus, the PSA, had it been properly authenticated and admitted, would have tied both Option One and Wells Fargo to the Veal Loan. The PSA did not, however, identify AHMSI in any capacity, including its alleged role as successor servicer or subservicer of the Veal Loan. The PSA is similarly unhelpful as to the current holder of the Note.

**6.** This contractual assignment of the Note was superfluous given the indorsement on the original note. *See* Uniform Commercial Code § 3–204.

The purported assignment from Option One to Wells Fargo was different, however, and more limited. It purported to transfer

the following described mortgage, *securing the payment of a certain promissory note(s) for the sum listed below,* together with all rights therein and thereto, all liens created or secured thereby, all obligations therein described, the money due and to become due thereon with interest, and all rights accrued or to accrue under such mortgage.

Thus, unlike the assignment from GSF to Option One, the purported assignment from Option One to Wells Fargo does not contain language effecting an assignment of the Note. While the Note is referred to, that reference serves only to identify the Mortgage. Moreover, unlike the first assignment, the record is devoid of any indorsement of the Note from Option One to Wells Fargo. As a consequence, even had the second assignment been considered as evidence, it would not have provided any proof of the transfer of the Note to Wells

Fargo. At most, it would have been proof that only the Mortgage, and all associated rights arising from it, had been assigned.[7]

### C. Joint Hearing on the Claim Objection and the Relief from Stay Motion

After several continuances of each matter, on February 3, 2010, the bankruptcy court held a joint hearing on the Veals' claim objection and Wells Fargo's relief from stay motion. Neither party presented evidence at the hearing, and the court's Local Rules prohibited them from presenting live testimony at this initial hearing unless the court had ordered otherwise. *See* Bankr. D. Ariz. R. 9014-2(a).[8] Indeed, the bankruptcy court referred to the hearing on the relief from stay motion as a preliminary hearing, thereby indicating that a subsequent evidentiary hearing would be set if necessary. *See* Bankr. D. Ariz. R. 4001-1(i)(2).[9]

Both parties presented oral argument, after which the bankruptcy court ruled

---

7. One might argue that the clauses in the assignment which follow the italicized appositive phrase are broad enough to pick up the Note, and thus effect a transfer of it. They do, after all, purport to transfer "all rights therein and thereto, ... all obligations therein described, [and] the money due and to become due thereon with interest." But given the carve out of the Note at the beginning of the sentence, the relative pronouns "therein," "thereto," and "thereon" more naturally refer back to the obligations contained in the Mortgage itself, such as the obligation to insure the Property, and not to an external obligation such as the Note. It would be odd indeed if, after referring to the Note but not explicitly making it the object of the transfer (as the initial assignment from GSF did), the words were made to curl back and pick up the Note just because the Mortgage mentioned the Note among its many terms. Although the clauses might be sufficiently vague to permit parol evidence to clarify their intended meaning, no such evidence was offered or requested.

8. Bankr. D. Ariz. R. 9014-2(a) provides:

**Hearings on Contested Matters**
 (a) Initial Hearing without Live Testimony. Pursuant to Bankruptcy Rule 9014(e), all hearings scheduled on contested matters will be conducted without live testimony except as otherwise ordered by the court. If, at such hearing, the court determines that there is a material factual dispute, the court will schedule a continued hearing at which live testimony will be admitted.

9. Bankr. D. Ariz. R. 4001-1(i)(2) provides:

**Automatic Stay—Relief From**
 (i) Procedure Upon Objection.
 (2) Relief may be granted or denied at the preliminary hearing based upon the affidavits, declarations, and other supporting documentation filed as part of the motion or objection if the opposing party's affidavits, declarations and supporting documentation fail to establish the existence of a material issue of fact that requires an evidentiary hearing.

from the bench. The bankruptcy court overruled the Veals' claim objection and granted the relief from stay motion. The court found that the documents presented adequately reflected Wells Fargo's standing, and the court stated that the issue of who qualified as holder of the note was irrelevant. According to the bankruptcy court, "At minimum, they [Wells Fargo] have demonstrated they are an assignee of the debt and the mortgage has apparently been assigned to them."

Notwithstanding this statement, the bankruptcy court made no findings regarding AHMSI's standing generally, or more specifically regarding whether AHMSI had established that it was Wells Fargo's authorized agent.

The Veals timely appealed both orders.

## III. DISCUSSION

■ The Veals challenge Wells Fargo's standing to seek relief from the stay and AHMSI's standing as a real party in interest with respect to the proof of claim it filed. Standing is a legal issue that we review de novo. *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 61 (9th Cir.1994); *Kronemyer v. Am. Contractors Indem. Co. (In re Kronemyer)*, 405 B.R. 915, 919 (9th Cir. BAP 2009).

### A. Standing in Mortgage Cases

■ A federal court may exercise jurisdiction over a litigant only when that litigant meets constitutional and prudential standing requirements. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). *See also Arizona Christian Sch. Tuition Org. v. Winn*, ─── U.S. ───, 131 S.Ct. 1436, 1442, 179 L.Ed.2d 523 (2011); *City of Los Angeles v.*

*County of Kern*, 581 F.3d 841, 845 (9th Cir.2009).

### 1. Constitutional Standing

■ Constitutional standing requires an injury in fact, which is caused by or fairly traceable to some conduct or some statutory prohibition, and which the requested relief will likely redress. *Winn*, 131 S.Ct. at 1442; *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 273–74, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008); *United Food & Comm'l Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).

■ Both Wells Fargo and AHMSI satisfy the relatively minimum requirements of constitutional standing: they each have shown injury in fact, causation, and redressability. Injury in fact is shown with respect to Wells Fargo by the automatic stay's prohibition on its right to exercise its alleged remedies against the Veals, and with respect to AHMSI by the effect of claim allowance procedures on its ability to receive a distribution from the Veals' estate. Causation exists by the simple fact that neither Wells Fargo nor AHMSI may exercise their nonbankruptcy remedies due to the existence of the automatic stay. Finally, redressability exists in each case because the relief requested, if appropriate, would address and remedy the claimed injury.

### 2. Prudential Standing

■ Even though Wells Fargo and AHMSI may meet the constitutional minima for standing, this determination does not end the inquiry. They must also show they have standing under various prudential limitations on access to federal courts. Prudential standing " 'embodies judicially self-imposed limits on the exercise of federal jurisdiction.' " *Sprint*, 554 U.S. at 289, 128 S.Ct. 2531 (quoting *Elk Grove*, 542

U.S. at 11, 124 S.Ct. 2301); *County of Kern,* 581 F.3d at 845.

■ In this case, one component of prudential standing is particularly applicable. It is the doctrine that a plaintiff must assert its own legal rights and may not assert the legal rights of others. *Sprint,* 554 U.S. at 289, 128 S.Ct. 2531; *Warth,* 422 U.S. at 499, 95 S.Ct. 2197; *Oregon v. Legal Servs. Corp.,* 552 F.3d 965, 971 (9th Cir.2009).

Here, the Veals allege that neither Wells Fargo nor AHMSI have shown they have any interest in the Note or any right to be paid by the Veals. They seek to invoke prudential standing principles which generally provide that a party without the legal right, under applicable substantive law, to enforce an obligation or seek a remedy with respect to it is not a real party in interest. *Doran v. 7–Eleven, Inc.,* 524 F.3d 1034, 1044 (9th Cir.2008). If the Veals' contention is correct as to AHMSI and Wells Fargo, then both creditors failed to satisfy their prudential standing burden.

### 3. Prudential Standing and the Real Party in Interest Doctrine

This formulation of the prudential standing doctrine, however, conflates somewhat with the real party in interest doctrine found in Rule 7017.[10] While at least one prominent authority maintains that the third party standing doctrine and the real

party in interest requirement are legally distinct, 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure, Civil* § 1542 (3d ed. 2010), another authority succinctly summarizes the practical distinction: "Generally, real parties in interest have standing, but not every party who meets the standing requirements is a real party in interest." 4 *Moore's Federal Practice* § 17.10[1], at p. 17–15 (3d ed. 2010) (footnotes omitted).

As a result, if neither Wells Fargo nor AHMSI is a real party in interest, we need not parse the remaining differences between standing and real party in interest status. We thus concentrate on real party in interest status and whether Wells Fargo or AHMSI met their burden of demonstrating that they qualified as real parties in interest.[11]

### 4. Real Party in Interest Status and Its Policies

Civil Rule 17(a)(1) starts simply: "An action must be prosecuted in the name of the real party in interest." Although the exact definition of a real party in interest may defy articulation, its function and purpose are well understood. As stated in the Advisory Committee Notes for Civil Rule 17,

**10.** Rule 7017 incorporates Civil Rule 17, and is applicable here through Rule 9014(c).

Some cases have suggested that Civil Rule 17(a), requiring the "real party in interest" to prosecute federal civil litigation in its own name, can effectuate the prudential limitation on third-party standing. *See, e.g., Dunmore v. United States,* 358 F.3d 1107, 1112 (9th Cir. 2004); *In re Hayes,* 393 B.R. 259, 267 (Bankr. D.Mass.2008). However, whatever the practical result of Civil Rule 17's application, the two remain distinct legal requirements, as discussed below.

**11.** In all of its various aspects, the standing issue is an inherently factual inquiry into the

nature of the rights asserted, *see, e.g., Sprint,* 554 U.S. at 271–73, 128 S.Ct. 2531, and the party asserting that it has standing bears the burden of proof to establish its standing. *Summers v. Earth Island Inst.,* 555 U.S. 488, ——, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009) (the movant "bears the burden of showing that he has standing for each type of relief sought"); *Bennett v. Spear,* 520 U.S. 154, 167–68, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Hasso v. Mozsgai (In re La Sierra Fin. Servs., Inc.),* 290 B.R. 718, 726 (9th Cir. BAP 2002). These cases require that the movant bear the burden of proving both constitutional and prudential standing.

In its origin the rule concerning the real party in interest was permissive in purpose: it was designed to allow an assignee to sue in his own name. That having been accomplished, the modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.

Notes of Advisory Committee on 1966 Amendments to Rule 17. *See also U-Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1039 (9th Cir.1986) (" 'The modern function of the rule . . . is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.' ") (quoting Advisory Committee Notes to the 1966 amendment of Civil Rule 17).

In this regard, most real party in interest inquiries focus on whether the plaintiff or movant holds the rights he or she seeks to redress. *See Moore's, supra,* § 17.10[1]. Was, for example, the plaintiff a party to the contract sought to be enforced? Did it have some other interest in the contract?

But in some cases, statutory or common law recognizes relationships in which parties may sue in their own name for the benefit of others. In these cases, real party in interest doctrine potentially alters results: it allows these third parties to sue in their own name on actions in which they may not have the ultimate or direct personal stake in the matter. A guardian, for example, may sue on behalf of his or her ward, even though the recovery is solely the ward's. Civil Rule 17(a)(1)(C). A bailee may sue in its own name for damage to goods entrusted to it, even though it does not own them. Civil Rule 17(a)(1)(D). Even assignees for collection may, under certain circumstances, sue in their own name on their assignor's debt. *See Sprint,* 554 U.S. at 284, 128 S.Ct. 2531 (dictum); *Staggers v. Otto Gerdau Co.,* 359 F.2d 292, 294 (2d Cir.1966); *Kilbourn v. Western Sur. Co.,* 187 F.2d 567, 571–72 (10th Cir. 1951).

■ Real party in interest doctrine thus melds procedural and substantive law; it ensures that the party bringing the action owns or has rights that can be vindicated by proving the elements of the claim for relief asserted. It also has another key aspect, as the Advisory Committee Notes acknowledge: if the party bringing the action loses on the merits, it ensures that the person defending the action can preclude anyone from ever seeking to vindicate, or collect on, that claim again.

### B. The Substantive Law Related to Notes Secured by Real Property

■ Real party in interest analysis requires a determination of the applicable substantive law, since it is that law which defines and specifies the wrong, those aggrieved, and the redress they may receive. 6A *Federal Practice and Procedure* § 1543, at 480–81 ("In order to apply Rule 17(a)(1) properly, it is necessary to identify the law that created the substantive right being asserted. . . ."). *See also id.* § 1544.

### 1. Applicability of UCC Articles 3 and 9 [12]

Here, the parties assume that the Uni-

---

12. This discussion owes much to a pending commentary of the Permanent Editorial Board for the Uniform Commercial Code. *See* John A. Sebert, *Draft Report of the PEB on the UCC Rules Applicable to the Assignment of Mortgage Notes and to the Ownership and Enforcement of Those Notes and the Mortgages Securing Them* (March 29, 2011), *available at* http://extranet.ali.org/directory/files/PEB_Report_on_Mortgage_Notes-Circulation_Draft.pdf (last visited June 10, 2011).

form Commercial Code ("UCC")[13] applies to the Note. If correct, then two articles of the UCC potentially apply.[14] If the Note is a negotiable instrument,[15] Article 3 provides rules governing the payment of the obligation represented by and reified in the Note.[16]

Article 3, however, deals primarily with payment obligations surrounding a negotiable instrument, and the identification of the proper party to be paid in order to satisfy and discharge the obligations represented by that negotiable instrument.

As will be seen, Article 3 does not necessarily equate the proper person to be paid with the person who owns the negotiable instrument. Nor does it purport to govern completely the manner in which those ownership interests are transferred. For the rules governing those types of property rights, Article 9 provides the substantive law.[17] UCC § 9–109(a)(3) (Article 9 "applies to ... a sale of ... promissory notes").[18] Article 9 includes rules, for example, governing the effect of the transfer of a note on any security given for that

**13.** As all fifty states have enacted the UCC, citations to the UCC in this opinion will be to the official text when discussing general propositions. Specific state enactments will be cited when applicable.

**14.** Even if the Note is not a "negotiable instrument," and thus Article 3 would not directly apply, it may "be appropriate, consistent with the principles stated in § 1–102(2) [now § 1–103], for a court to apply one or more provisions of Article 3 to the writing by analogy, taking into account the expectations of the parties and the differences between the writing and an instrument governed by Article 3." Comment 2 to UCC § 3–104. *See also* Fred H. Miller & Alvin C. Harrell, *The Law of Modern Payment Systems* § 1.03[1][b] (2003).

**15.** *See* UCC § 3–102 ("This Article applies to negotiable instruments."). The term "negotiable instrument" is defined in UCC § 3–104(a) to mean:

an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

(1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

(2) is payable on demand or at a definite time; and

(3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended

for the advantage or protection of an obligor.

**16.** Article 3 carries forward and codifies venerable commercial law rules developed over several centuries during which negotiable instruments played a much different role in commerce than they do today. As stated by Grant Gilmore, Article 3 is not unlike a "museum of antiquities—a treasure house crammed full of ancient artifacts whose use and function have long since been forgotten." Grant Gilmore, *Formalism and the Law of Negotiable Instruments*, 13 Creighton L. Rev. 441, 461 (1979). His following quotation is apt and often-repeated: "codification ... preserve[d] the past like a fly in amber". *Id.*

**17.** Unlike Article 3, Article 9 is a relatively recent innovation which attempts, among other things, to regularize nonpossessory financing. It was last completely revised in 1999, although there are currently amendments to that version being offered for adoption by the states.

**18.** UCC § 9–109(a)(3) states that Article 9 applies to any sale of a "promissory note," which is defined in § 9–102(a)(65) as "an instrument that evidences a promise to pay a monetary obligation, [or] does not evidence an order to pay...." In turn, an "instrument" under Article 9 is defined as "a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment." UCC § 9–102(a)(47).

note such as a mortgage or a deed of trust.[19] As a consequence, Article 9 must be consulted to answer many questions as to who owns or has other property interest in a promissory note. From this it follows that the determination of who holds these property interests will inform the inquiry as to who is a real party in interest in any action involving that promissory note.

As a result, this opinion examines the relevant provisions of Article 3 and Article 9 as they apply to the Veals' Note and Mortgage, as each Article may provide substantive law that shapes the relevant real party in interest inquiry.

*2. Article 3 of the UCC and the Concept of a "Person Entitled to Enforce" a Note*

■ Article 3 provides a comprehensive set of rules governing the obligations of parties on the Note, including how to determine who may enforce those obligations and to whom those obligations are owed. *See* UCC § 3–102; Miller & Harrell, *supra*, § 1.02. Contrary to popular opinion, these rules do not absolutely require physical possession of a negotiable instrument in order to enforce its terms. Rather, Article 3 states that the ability to enforce a particular note—a concept central to our standing inquiry—is held by the "person entitled to enforce" the note. UCC § 3–301.

A thorough understanding of the concept of a "person entitled to enforce" is key to sorting out the relative rights and obligations of the various parties to a mortgage transaction. In particular, the person obligated on the note—a "maker" in the argot of Article 3 [20]—must pay the obligation represented by the note to the "person entitled to enforce" it. UCC § 3–412. Further, if a maker pays a "person entitled to enforce" the note, the maker's obligations are discharged to the extent of the amount paid. UCC § 3–602(a). Put another way, if a maker makes a payment to a "person entitled to enforce," the obligation is satisfied on a dollar for dollar basis, and the maker never has to pay that amount again. *Id. See also* UCC § 3–602(c).

If, however, the maker pays someone other than a "person entitled to enforce"—even if that person physically possesses the note the maker signed—the payment generally has no effect on the obligations under the note.[21] The maker still owes the money to the "person entitled to enforce," Miller & Harrell, *supra*, ¶ 6.03[6][b][ii], and, at best, has only an action in restitution to recover the mistaken payment. *See* UCC § 3–418(b).

■ At least two ways exist in which a person can acquire "person entitled to enforce" status.[22] To enforce a note under the method most commonly employed, the

19. *See* UCC § 9–203(g) ("The attachment of a security interest in a right to payment or performance secured by a security interest or other lien on personal or real property is also attachment of a security interest in the security interest, mortgage, or other lien.").

20. *See* UCC § 3–103(a)(7).

21. The 2002 Amendments to Article 3 provided a limited exception for notes transferred without notice to the maker. UCC § 3–602(b). *See* 2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 16–12, at 146 (5th ed. 2008).

22. Another method is uncommon and does not require possession of the note. Under UCC § 3–301(iii), a person may be a "person entitled to enforce the note" if, among other things, "the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process." UCC § 3–309(a)(3). The burden of showing these factual predicates is on the person attempting to enforce the negotiable instrument. Here, however, the Note is not alleged to be lost or stolen.

person must be the "holder" of the note. UCC § 3–301(i).

The concept of a "holder" is set out in detail in UCC § 1–201(b)(21)(A), providing that a person is a holder if the person possesses the note and either (i) the note has been made payable to the person who has it in his possession [23] or (ii) the note is payable to the bearer of the note. This determination requires physical examination not only of the face of the note but also of any indorsements.[24]

▆▆ The Veals contend that only a holder may enforce the Note, or seek relief from the automatic stay to enforce it. Their analysis is incomplete, for Article 3 provides another way in which an entity can become a "person entitled to enforce" a negotiable instrument. This third way involves the person attaining the status of a "nonholder in possession of the [note] who has the rights of a holder." UCC § 3–301(ii). This definition, however, seems at odds with itself; one can legitimately ask how a person who is not the holder of a note possesses the rights of a holder?

The answer to this question involves a combination of history and practicality. Non–UCC law can bestow this type of status; such law may, for example, recognize various classes of successors in interest such as subrogees or administrators of

decedent's estates. *See* Comment to UCC § 3–301. More commonly, however, a person becomes a nonholder in possession if the physical delivery of the note to that person constitutes a "transfer" but not a "negotiation." *Compare* UCC § 3–201 (definition of negotiation) *with* UCC § 3–203(a) (definition of transfer). Under the UCC, a "transfer" of a negotiable instrument "vests in the transferee any right of the transferor to enforce the instrument." UCC § 3–203(b). As a result, if a holder transfers the note to another person by a process not involving an Article 3 negotiation—such as a sale of notes in bulk without individual indorsement of each note— that other person (the transferee) obtains from the holder the right to enforce the note even if no negotiation takes place and, thus, the transferee does not become an Article 3 "holder." *See* Comment 1 to UCC § 3–203.

▆▆ This places a great deal of weight on the UCC's definition of a "transfer." UCC § 3–203(a) states that a note is transferred "when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." As a consequence, while the failure to obtain the indorsement of the payee or other holder does not prevent a person in possession of the note from being the "person entitled to enforce" the note, it does raise

---

**23.** The person in possession of the note must be identified as such. This concept of identification begins with the issuance of a note to a payee. To be covered by Article 3, the note must be negotiable, which generally means the note must have "words of negotiability;" that is, the note must be initially payable to the stated payee, "or order." The two words "or order" have come to mean that the person identified for purposes of "holder" status generally needs to be identical with the last listed indorser on the note (assuming the note has not become a bearer instrument).

So if A makes a note payable to "B or order," and B indorses the note to C, C is a

holder if C is in possession. If D steals the note from C, D is not the holder, even if he forges C's indorsement. The process of transfer is called "negotiation," which UCC § 3–201(a) defines as "a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder."

**24.** This would include checking to see if any purported allonge was sufficiently affixed as required by UCC § 3–204(a). *See In re Weisband*, 427 B.R. 13, 19–20 (Bankr.D.Ariz. 2010); *In re Shapoval*, 441 B.R. 392, 394 (Bankr.D.Mass.2010).

the stakes. Without holder status and the attendant presumption of a right to enforce, the possessor of the note must demonstrate both the fact of the delivery and the purpose of the delivery of the note to the transferee in order to qualify as the "person entitled to enforce."

### 3. Article 9 and Transfers of Ownership and Other Interests in a Promissory Note

 The "transfer" concept is not only bound up in the enforcement of the maker's obligation to pay the debt evidenced by the note, but also in the ownership of those rights. Put another way, one can be an owner of a note without being a "person entitled to enforce." [25] This distinction may not be an easy one to draw, but it is one the UCC clearly embraces. While in many cases the owner of a note and the person entitled to enforce it are one and the same, this is not always the case, and those cases are precisely the cases in which Civil Rule 17 would require joinder of the real party in interest.

 This distinction further recognizes that the rules that determine who is entitled to enforce a note are concerned primarily with the maker of the note. They are designed to provide for the maker a relatively simple way of determining to whom the obligation is owed and, thus, whom the maker must pay in order to avoid defaulting on the obligation. UCC § 3–602(a), (c). By contrast, the rules concerning transfer of ownership and other interests in a note identify who, among competing claimants, is entitled to the note's economic value (that is, the value of the maker's [26] promise to pay). Under established rules, the maker should be indifferent as to who owns or has an interest in the note so long as it does not affect the maker's ability to make payments on the note. Or, to put this statement in the context of this case, the Veals should not care who actually owns the Note—and it is thus irrelevant whether the Note has been fractionalized or securitized—so long as they do know who they should pay. Returning to the patois of Article 3, so long as they know the identity of the "person entitled to enforce" the Note, the Veals should be content.[27]

**25.** The converse is also true: one can be a "person entitled to enforce" without having any ownership interest in the negotiable instrument, such as when a thief swipes and absconds with a bearer instrument. *See* Comment 1 to UCC § 3–301. The ability of a thief to legitimately obtain payment on bearer instruments, such as bearer bonds, has factored in literature and film focusing on the dark side of humanity. *See, e.g.,* F. Scott Fitzgerald, *The Great Gatsby* ch. 9 (1925) (part of Gatsby's downfall connected with the theft or falsification of bearer bonds); *Die Hard* (Twentieth Century Fox Film Corp. 1988) (thieves masquerading as international terrorists seek to steal a highly valuable trove of bearer bonds); *Beverly Hills Cop* (Paramount Pictures 1984) (friend of protagonist is murdered for stealing bearer bonds from a drug operation's kingpin).

Bearer bonds in the United States (but not internationally) were essentially eliminated in 1982 by the imposition of high tax penalties on their issuance. *See* Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, § 47109, 96 Stat. 596 (codified at 26 U.S.C. § 4701(a)).

**26.** As well as any indorser's obligation to pay. *See* UCC § 3–415(a).

**27.** To re-emphasize the oft-overlooked point: Article 3 is sufficiently flexible to allow a single identified person to be both the "person entitled to enforce" the note, and an agent for all those who may have ownership interests in a note. This point reflects the view that so long as the maker's obligation is discharged by payment, the maker should be indifferent as to whether the "person entitled to enforce" the note satisfies his or her obligations, under the law of agency, to the ultimate owners of the note.

Initially, a note is owned by the payee to whom it was issued. If that payee seeks either to use the note as collateral or sell the note outright to a third party in a manner not within Article 3,[28] Article 9 of the UCC governs that sale or loan transaction and determines whether the purchaser of the note or creditor of the payee obtains a property interest in the note. *See* UCC § 9–109(a)(3).

With very few exceptions, the same rules that apply to transactions in which a payment right serves as collateral for an obligation also apply to transactions in which a payment right is sold outright. *See* UCC § 9–203. Rather than contain two parallel sets of rules—one for transactions in which payment rights are collateral and the other for sales of payment rights—Article 9 uses nomenclature conventions to apply one set of rules to both types of transactions. This is accomplished primarily by defining the term "security interest," found in UCC § 1–201(b)(35),[29] to include not only an interest in property that secures an obligation, but also the right of a purchaser of a payment right such as a promissory note. *Cf.* UCC § 1–201(b)(35) (The term "security interest" also "includes any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a transaction that is subject to Article 9.").

 Here, neither AHMSI nor Wells Fargo was the initial payee of the Note. Due to this fact, each was required to demonstrate facts sufficient to establish its respective standing. *See* note 11, *supra.* In this regard, facts that would be sufficient for AHMSI are different from those that would be sufficient for Wells Fargo. As to Wells Fargo, it had to show it had a colorable claim to receive payment

pursuant to the Note, which it could accomplish either by showing it was a "person entitled to enforce" the Note under Article 3, or by showing that it had some ownership or other property interest in the Note. As to AHMSI, as it sought a distribution from the estate in payment of the Note, it had to show that it was a "person entitled to enforce" the Note, or was the agent of such a person.

### C. Wells Fargo's Lack of Standing to Seek Relief from the Automatic Stay

Wells Fargo sought relief from the automatic stay to foreclose on the Property. The automatic stay, however, prevents "all proceedings relating to a foreclosure sale." *Mann v. ADI Invs., Inc. (In re Mann)*, 907 F.2d 923, 926–27 (9th Cir.1990). As a result, to take any action other than filing a proof of claim, Wells Fargo had to seek relief from the stay.

#### 1. Standing to Seek Relief from Automatic Stay

 Under § 362(d), the bankruptcy court may grant relief from the automatic stay "[o]n request of a party in interest." The Bankruptcy Code does not define the term "party in interest." "Status as 'a party in interest' under § 362(d) 'must be determined on a case-by-case basis, with reference to the interest asserted and how [that] interest is affected by the automatic stay.'" *Kronemyer*, 405 B.R. at 919 (quoting *In re Woodberry*, 383 B.R. 373, 378 (Bankr.D.S.C.2008)).

Our prior precedent is appropriately lenient with respect to standing for stay relief. This Panel said in *Kronemyer* that "[c]reditors may obtain relief from the stay if their interests would be harmed by continuance of the stay." *Kronemyer*, 405

---

**28.** That is, it transfers a note in a manner not contemplated by Article 3.

**29.** Article 9 explicitly incorporates definitions found in Article 1. UCC § 9–102(c).

B.R. at 921. *Collier* uses a similarly expansive statement: "Any party affected by the stay should be entitled to seek relief." 3 *Collier on Bankruptcy* ¶ 362.07[2] (Henry Sommer and Alan Resnick, eds., 16th ed. 2011).

This test expands or contracts to match the interests sought to be asserted. A servicer, for example, might be delegated all its principal's rights, or it could simply be asserting its separate right to be paid out of the mortgage payments. *Cf. CWCapital Asset Mgmt., LLC v. Chicago Props., LLC,* 610 F.3d 497, 500–01 (7th Cir.2010) ("The servicer is much like an assignee for collection, who must render to the assignor the money collected by the assignee's suit on his behalf (minus the assignee's fee) but can sue in his own name without violating Rule 17(a)."); *In re Hayes,* 393 B.R. 259, 267 (Bankr.D.Mass.2008) ("[S]ervicers are parties in interest with standing by virtue of their pecuniary interest in collecting payments under the terms of the notes and mortgages they service."); *In re Woodberry,* 383 B.R. 373, 379 (Bankr. D.S.C.2008). In either event, the servicer has standing to request some relief from the automatic stay.

But *Kronemyer* does not precisely address the discrete issue presented here: whether Wells Fargo's interests are "harmed by the continuance of the stay." The answer to that question requires examination of both the nature of stay litigation generally and the specific nature of the nonbankruptcy rights Wells Fargo seeks to vindicate.

 Relief from stay proceedings such as the one brought by Wells Fargo are primarily procedural; they determine whether there are sufficient countervailing equities to release an individual creditor from the collective stay. One consequence of this broad inquiry is that a creditor's claim or security is not finally determined in the relief from stay proceeding. *Johnson v. Righetti (In re Johnson),* 756 F.2d 738, 740–41 (9th Cir.1985) ("Hearings on relief from the automatic stay are thus handled in a summary fashion. The validity of the claim or contract underlying the claim is not litigated during the hearing."); *Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 33 (1st Cir.1994) ("We find that a hearing on a motion for relief from stay is merely a summary proceeding of limited effect...."); *First Fed. Bank v. Robbins (In re Robbins),* 310 B.R. 626, 631 (9th Cir. BAP 2004).

As a result, stay relief litigation has very limited claim preclusion effect, in part because the ultimate resolution of the parties' rights are often reserved for proceedings under the organic law governing the parties' specific transaction or occurrence. Stay relief involving a mortgage, for example, is often followed by proceedings in state court or actions under nonjudicial foreclosure statutes to finally and definitively establish the lender's and the debtor's rights.[30] In such circumstances, the concern of real party in interest jurisprudence for avoiding double payment is quite reduced.

 Given the limited nature of the relief obtained through a motion for relief from the stay, the expedited hearing schedule § 362(e) provides, and because final adjudication of the parties' rights and liabilities is yet to occur, this Panel has held that a party seeking stay relief need only establish that it has a colorable claim to enforce a right against property of the

---

**30.** An obvious exception to this paradigm occurs when the bankruptcy court has already sustained a claim objection to a movant's proof of claim. In such cases, the doctrine that security depends on the debt it secures controls, and with the debt disallowed, the movant normally cannot pursue the real property security outside of bankruptcy. *See* 4 Richard R. Powell, *Powell on Real Property,* § 37.27[2] (2000).

estate. *United States v. Gould (In re Gould)*, 401 B.R. 415, 425 n. 14 (9th Cir. BAP 2009); *Biggs v. Stovin (In re Luz Int'l, Ltd.)*, 219 B.R. 837, 842 (9th Cir. BAP 1998). *See also Grella*, 42 F.3d at 32.

## 2. Wells Fargo's Argument Regarding Standing

Although expansive, this principle is not without limits. In granting Wells Fargo's motion for relief from stay, the bankruptcy court found that Wells Fargo had established a "colorable claim" based on two of Wells Fargo's exhibits: (1) a copy of an assignment of mortgage from GSF (the original lender) to Option One (the "GSF Assignment"); and (2) a copy of an assignment of mortgage from Sand Canyon Corporation formerly known as Option One Mortgage Corporation to Wells Fargo (the "Sand Canyon Assignment"). According to the bankruptcy court, whoever possessed or held rights in the Note was irrelevant.

 A bankruptcy court's determinations regarding stay relief are reviewed for an abuse of discretion, *Kronemyer*, 405 B.R. at 919. The abuse of discretion test involves two distinct determinations: first, whether the court applied the correct legal standard; and second, whether the factual findings supporting the legal analysis were clearly erroneous. *United States v. Hinkson*, 585 F.3d 1247, 1261–63 (9th Cir.2009) (en banc).

If the court failed to apply the correct legal standard, then it has "necessarily abuse[d] its discretion." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). This prong of the determination is considered de novo. *Hinkson*, 585 F.3d at 1261–62. If the court applied the correct legal standard, the inquiry then moves to whether the factual findings made were clearly erroneous. *Id.* at 1262. Under *Hinkson*, factual findings are clearly erroneous if

they are "illogical, implausible, or without support in inferences that may be drawn from the record." *Id.* at 1263. *See also* Rule 8013.

Against these high standards, the Veals pursue two different arguments. Initially, they argue that the GSF Assignment is invalid because it bears an undated notarial acknowledgment. They also argue that the Sand Canyon Assignment is invalid because it was not executed until after the Veals filed for bankruptcy and after Wells Fargo filed its relief from stay motion. *See In re Maisel*, 378 B.R. 19, 21–22 (Bankr.D.Mass.2007) (denying relief from stay because movant's standing was dependent on an assignment of mortgage dated after the filing of the relief from stay motion).

## 3. Wells Fargo's Lack of a Connection to the Note

 The Veals' first argument would seem to require a factual investigation of the circumstances under which the Mortgage and the subsequent assignments were signed. But we need not remand for that determination. The Veals have a second argument, and it has merit. They assert that, as a matter of law, the bankruptcy court applied an incorrect legal principle in determining that Wells Fargo had an ownership or other property interest in the Note. The Veals argue that had the bankruptcy court applied the correct test, it would have found that Wells Fargo had not established such an interest, and thus its asserted rights under the Mortgage did not constitute a colorable claim to enforce a right against property of the estate.

 The key to this argument is that, under the common law generally, the transfer of a mortgage without the transfer of the obligation it secures renders the mortgage ineffective and unenforceable in the hands of the transferee. *Restatement (Third) of Property (Mortgages)* § 5.4 cmt.

e (1997) ("in general a mortgage is unenforceable if it is held by one who has no right to enforce the secured obligation").[31] As stated in a leading real property treatise:

> When a note is split from a deed of trust "the note becomes, as a practical matter, unsecured." Restatement (Third) of Property (Mortgage) § 5.4 cmt. a (1997). Additionally, if the deed of trust was assigned without the note, then the assignee, "having no interest in the underlying debt or obligation, has a worthless piece of paper."

4 Richard R. Powell, *Powell on Real Property*, § 37.27[2] (2000). *Cf. In re Foreclosure Cases*, 521 F.Supp.2d 650, 653 (S.D.Ohio 2007) (finding that one who did not acquire the note which the mortgage secured is not entitled to enforce the lien of the mortgage); *In re Mims*, 438 B.R. 52, 56 (Bankr.S.D.N.Y.2010) ("Under New York law 'foreclosure of a mortgage may not be brought by one who has no title to it and absent transfer of the debt, the assignment of the mortgage is a nullity.'") (quoting *Kluge v. Fugazy*, 145 A.D.2d 537, 536 N.Y.S.2d 92, 93 (N.Y.App.Div.1988)).

▇▇▇▇▇ In this case, Illinois law governs the issues related to the Mortgage's enforcement,[32] and Illinois follows this rule.

> Illinois ... courts treat a mortgage as incident or accessory to the debt, and,

an assignment of a mortgage without the note as a nullity. In order for the Illinois ... courts to enforce a mortgage assignment, the assignor must assign the underlying debt secured by the mortgage debt. It is axiomatic that any attempt to assign the mortgage without transfer of the debt will not pass the mortgagee's interest to the assignee.

*Yorke v. Citibank (In re BNT Terminals, Inc.)*, 125 B.R. 963, 970 (Bankr.N.D.Ill. 1990) (citing *Krueger v. Dorr*, 22 Ill.App.2d 513, 161 N.E.2d 433, 440–41 (1959); *Moore v. Lewis*, 51 Ill.App.3d 388, 9 Ill.Dec. 337, 366 N.E.2d 594, 599 (1977); *Commercial Prods. Corp. v. Briegel*, 101 Ill.App.2d 156, 242 N.E.2d 317, 321 (1968); and *Lundy v. Messer*, 25 Ill.App.2d 513, 167 N.E.2d 278, 279 (1960)).

This rule appears to be the common law rule. *See, e.g., Restatement (Third) of Property (Mortgage)* § 5.4 (1997); *Carpenter v. Longan*, 83 U.S. 271, 274–75, 16 Wall. 271, 21 L.Ed. 313 (1872) ("The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity."); *Orman v. North Alabama Assets Co.*, 204 F. 289, 293 (N.D.Ala.1913); *Rockford Trust Co. v. Purtell*, 183 Ark. 918, 39 S.W.2d 733 (1931).[33] While we are aware that some

---

**31.** It does not, of course, affect the obligations which have been secured; only the rights to security for those obligations are affected.

**32.** The Mortgage contains a choice of law provision, which states that the law of the state where the real property is located applies to "this Security Instrument." The Property is located in Illinois, so this clause would require application of Illinois law to issues concerning enforcement of the Mortgage.

This choice of law provision is consistent with the common law. *See Restatement (Second) of Conflict of Laws* § 229. As will be

seen later, the Note is governed by the law of Arizona. *See* note 41, *infra*. The application of different choice of law rules to the Note and the Mortgage is consistent with the common law: "Issues which do not affect any interest in the land, although they do relate to the foreclosure, are determined, on the other hand, by the law which governs the debt for which the mortgage was given." *Id.*

**33.** The Restatement also sets up a general presumption that the transfer of a mortgage normally includes an assignment of the obligation it secured. *Id.* § 5.4(b) ("Except as otherwise required by the Uniform Commercial Code, a transfer of a mortgage also

states may have altered this rule by statute, that is not the case here.[34]

As a result, to show a colorable claim against the Property, Wells Fargo had to show that it had some interest in the Note, either as a holder, as some other "person entitled to enforce," or that it was someone who held some ownership or other interest in the Note. *See In re Hwang*, 438 B.R. 661, 665 (C.D.Cal.2010) (finding that holder of note has real party in interest status). None of the exhibits attached to Wells Fargo's papers, however, establish its status as the holder, as a "person entitled to enforce," or as an entity with any ownership or other interest in the Note.

Not surprisingly, Wells Fargo disagrees. It argues that it submitted documents in support of its relief from stay motion which established a "colorable claim" against property of the estate. In this regard, it cites *In re Robbins*, 310 B.R. 626, 631 (9th Cir. BAP 2004) (which in turn cites *Grella*, 42 F.3d at 32). However, neither *Robbins* nor *Grella* dealt with a challenge to the movant's standing which, as we have said, is an independent threshold issue. Simply put, the colorable claim standard set forth in *Robbins* does not free Wells Fargo from the burden of establishing its status as a real party in interest allowing it to move for relief from stay, as this is the way in which Wells Fargo satisfies its prudential standing requirement.

In particular, because it did not show that it or its agent had actual possession of the Note, Wells Fargo could not establish that it was a holder of the Note, or a "person entitled to enforce" the Note.[35] In addition, even if admissible, the final purported assignment of the Mortgage was insufficient under Article 9 to support a conclusion that Wells Fargo holds any in-

---

transfers the obligation the mortgage secures unless the parties to the transfer agree otherwise"). But as we have previously noted, *see* text accompanying note 7 *supra*, the mortgage assignment to Wells Fargo did not also assign the Note.

**34.** We are aware of statutory law and unreported cases in this circuit that may give lenders a nonbankruptcy right to commence foreclosure based solely upon their status as assignees of a mortgage or deed of trust, and without any explicit requirement that they have an interest in the note. *See, e.g.,* Cal. Civil Code §§ 2924(a)(1) (a "trustee, mortgagee or beneficiary or any of their authorized agents" may conduct the foreclosure process); 2924(b)(4) (a "person authorized to record the notice of default or the notice of sale" includes "an agent for the mortgagee or beneficiary, an agent of the named trustee, any person designated in an executed substitution of trustee, or an agent of that substituted trustee."); *Putkkuri v. Recontrust Co.,* No. 08cv1919, 2009 WL 32567 at *2 (S.D.Cal. Jan.5, 2009) ("Production of the original note is not required to proceed with a non-judicial foreclosure."); *Candelo v. NDex West, LLC,* No. 08–1916, 2008 WL 5382259 at *4 (E.D.Cal. Dec.23, 2008) ("No requirement ex-

ists under the statutory framework to produce the original note to initiate non-judicial foreclosure."); *San Diego Home Solutions, Inc. v. Recontrust Co.,* No. 08cv1970, 2008 WL 5209972 at *2 (S.D.Cal. Dec.10, 2008) ("California law does not require that the original note be in the possession of the party initiating non-judicial foreclosure."). *But see In re Salazar,* 448 B.R. 814, 819 (Bankr.S.D.Cal. 2011) (valid foreclosure under California law requires both that the foreclosing party be entitled to "payment of the secured debt" and that its "status as foreclosing beneficiary appear before the sale in the public record title for the [p]roperty."). We express no view of the interaction of these statutes and real party in interest requirements under Civil Rule 17.

Ultimately, the minimum requirements for the initiation of foreclosures under applicable nonbankruptcy law will shape the boundaries of real party in interest status under Civil Rule 17 with respect to relief from stay matters. As a consequence, the result in a given case may often depend upon the situs of the real property in question.

**35.** As indicated above, *see* note 22 *supra,* there is no argument that the note is lost or destroyed.

terest, ownership or otherwise, in the Note. Put another way, without any evidence tending to show it was a "person entitled to enforce" the Note, or that it has an interest in the Note, Wells Fargo has shown no right to enforce the Mortgage securing the Note. Without these rights, Wells Fargo cannot make the threshold showing of a colorable claim to the Property that would give it prudential standing to seek stay relief or to qualify as a real party in interest.

Accordingly, the bankruptcy court erred when it granted Wells Fargo's motion for relief from stay, and we must reverse that ruling.

### D. AHMSI's Lack of Standing to File Proof of Claim

AHMSI's proof of claim presents similar issues, but in a different context. An order overruling a claim objection can raise legal issues (such as the proper construction of statutes and rules) which we review de novo, as well as factual issues (such as whether the facts establish compliance with particular statutes or rules), which we review for clear error. *Campbell v. Verizon Wireless (In re Campbell)*, 336 B.R. 430, 434 (9th Cir. BAP 2005); *Heath v. Am. Express Travel Related Servs. Co. (In re Heath)*, 331 B.R. 424, 428–29 (9th Cir. BAP 2005).

▮▮▮▮ The Veals contend that AHMSI's purported claim—as opposed to any security for that claim—is subject to objection under Article 3 of the UCC. If correct, their nonbankruptcy objection provides a sufficient basis for disallowance of the claim. § 502(b)(1). When ruling on such an objection, the bankruptcy court makes

a substantive ruling that binds the parties in all other proceedings and may finally adjudicate the parties' underlying rights. As stated in *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966):

> The bankruptcy courts "have summary jurisdiction to adjudicate controversies relating to property over which they have actual or constructive possession."

*Id.* at 327, 86 S.Ct. 467 (quoting *Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 481, 60 S.Ct. 628, 84 L.Ed. 876 (1940)). Courts have adopted this characterization of the effect of claim objection proceedings under the somewhat different, and more expansive, jurisdictional structure in place under the 1978 Bankruptcy Code. *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir.2007); *Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525, 529–30 (9th Cir.1998); *Bank of Lafayette v. Baudoin (In re Baudoin)*, 981 F.2d 736, 742 (5th Cir.1993).

Consistent with this view, orders in claim objection proceedings have been given issue and claim preclusive effect. As stated in *Katchen*,

> The normal rules of *res judicata* and collateral estoppel apply to the decisions of bankruptcy courts. More specifically, a creditor who offers a proof of claim and demands its allowance is bound by what is judicially determined; and if his claim is rejected, its validity may not be relitigated in another proceeding on the claim.

382 U.S. at 334, 86 S.Ct. 467 (citations omitted). In short, a claims objection proceeding in bankruptcy takes the place of the state court lawsuit or other action because such actions are presumptively stayed by the operation of § 362.[36]

---

**36.** The process, of course, is sufficiently flexible to allow bankruptcy courts in appropriate cases to defer to nonbankruptcy courts to liquidate and settle the parties' claims and contentions. *See, e.g., Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir.1990);

*Goya Foods, Inc. v. Unanue–Casal (In re Unanue–Casal)*, 159 B.R. 90, 96 (D.P.R.1993), *aff'd*, 23 F.3d 395 (1st Cir.1994); *Busch v. Busch (In re Busch)*, 294 B.R. 137, 141 n. 4 (10th Cir. BAP 2003) (collecting cases); *Truebro, Inc. v. Plumberex Specialty Prods.,*

■ The Veals challenge AHMSI's status as the real party in interest to file a proof of claim with respect to the Note. This argument stands on somewhat different grounds than the similar objection to Wells Fargo's stay relief. Unlike a motion for relief from the stay, the claim allowance procedure has finality, as § 502(b)(1) explicitly directs a bankruptcy court to disallow a claim if a legitimate nonbankruptcy law defense exists. Again, unlike motions for relief from the automatic stay, there will be no subsequent determination of the parties' relative rights and responsibilities in another forum. The proceedings in the bankruptcy court are the final determination. As a result, Civil Rule 17's policy of preventing multiple liability is fully implicated.

AHMSI apparently conceded that Wells Fargo held the economic interest in the Note, as it filed the proof of claim asserting that it was Wells Fargo's authorized agent. Rule 3001(b) permits such assertions, and such assertions often go unchallenged. But here the Veals did not let it pass; they affirmatively questioned AHMSI's standing. In spite of this challenge, AHMSI presented no evidence showing any agency or other relationship with Wells Fargo and no evidence showing that either AHMSI or Wells Fargo was a "person entitled to enforce" the Note. That

failure should have been fatal to its position.

### 1. The Lack of Findings on Central Issues

■ The filing of an objection to claim initiates a contested matter, subject to the procedures set forth in Rule 9014. *See* Advisory Committee Notes accompanying Rule 3007.[37] In contested matters, a bankruptcy court must make findings of fact, either orally on the record, or in a written decision. *See* Rule 9014(c) (incorporating Rule 7052, which in turn incorporates Civil Rule 52).[38] These findings must be sufficient to enable a reviewing court to determine the factual basis for the court's ruling. *Vance v. Am. Hawaii Cruises, Inc.,* 789 F.2d 790, 792 (9th Cir.1986). Although the bankruptcy court here overruled the Veals' objection to AHMSI's proof of claim, it did so without making any findings or even any statements regarding the factual basis for the court's conclusion that AHMSI had standing to file the proof of claim.[39] It simply held that being an assignee (or agent of the assignee) of the Mortgage was sufficient.

■ Even when a bankruptcy court does not make formal findings, however, the BAP may conduct appellate review "if a complete understanding of the issues may be obtained from the record as a whole or if there can be no genuine dispute

---

*Inc. (In re Plumberex Specialty Prods., Inc.),* 311 B.R. 551, 557–58 (Bankr.C.D.Cal.2004).

The bankruptcy court, however, has exclusive jurisdiction over the estate property that will be distributed on such claim, 28 U.S.C. § 1334(e), and exclusive jurisdiction over the distribution of estate property.

**37.** The Advisory Committee Notes accompanying the original version of Rule 3007, promulgated in 1983, in relevant part state that "[t]he contested matter initiated by an objection to a claim is governed by rule 9014." The Advisory Committee Notes accompanying the 2007 amendments do not alter this view.

**38.** Civil Rule 52(a)(1) provides in relevant part: (a) Findings and Conclusions.

(1) In General. In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.

**39.** Given the lack of documentation provided in response to the Veals' objection, it is not surprising that the bankruptcy court made no findings on the disputed factual issues. *See* note 7, *supra.*

about omitted findings." *Gardenhire v. Internal Revenue Serv. (In re Gardenhire)*, 220 B.R. 376, 380 (9th Cir. BAP 1998), *rev'd on other grounds*, 209 F.3d 1145 (9th Cir.2000) (citing *Vance*, 789 F.2d at 792; *Magna Weld Sales Co. v. Magna Alloys & Research Pty., Ltd.*, 545 F.2d 668, 671 (9th Cir.1976)). *See also Jess v. Carey (In re Jess)*, 169 F.3d 1204, 1208–09 (9th Cir.1999); *Swanson v. Levy*, 509 F.2d 859, 860–61 (9th Cir.1975). After such a review, however, when the record does not contain a clear basis for the court's ruling, we must vacate the court's order and remand for further proceedings. *See, e.g., Alpha Distr. Co. v. Jack Daniel Distillery*, 454 F.2d 442, 452–53 (9th Cir.1972); *Canadian Comm'l Bank v. Hotel Hollywood (In re Hotel Hollywood)*, 95 B.R. 130, 132–34 (9th Cir. BAP 1988).

■ We have conducted such a review of the record, and we have found nothing in the record that establishes AHMSI's standing to file the proof of claim. Neither party offered any testimony, either by way of declaration or by way of live testimony of witnesses, to support their respective positions on these contested factual issues. None of the documents attached to the parties' papers show that AHMSI was the servicing agent of Wells Fargo, let alone a servicing agent of a "person entitled to enforce" the Note.[40]

When debtors such as the Veals challenge an alleged servicer's standing to file a proof of claim regarding a note governed by Article 3 of the UCC, that servicer must show it has an agency relationship with a "person entitled to enforce" the note that is the basis of the claim. If it does not, then the servicer has not shown

that it has standing to file the proof of claim. *See, e.g., In re Minbatiwalla*, 424 B.R. 104, 108–11 (Bankr.S.D.N.Y.2010); *Hayes*, 393 B.R. at 266–70; *In re Parrish*, 326 B.R. 708, 720–21 (Bankr.N.D.Ohio 2005).

The bankruptcy court here apparently concluded as a matter of law that the identity of the person entitled to enforce the Note was irrelevant. Its analysis followed the Mortgage instead of the Note. We disagree. In the context of a claim objection, both the injury-in-fact requirement of constitutional standing and the real party in interest requirement of prudential standing hinge on who holds the right to payment under the Note and hence the right to enforce the Note. *In re Weisband*, 427 B.R. 13, 18–19 (Bankr. D.Ariz.2010). *See also U–Haul*, 793 F.2d at 1038 (holding that real party in interest is the "party to whom the relevant substantive law grants a cause of action"). In other words, Wells Fargo (or AHMSI as Wells Fargo's servicer) must be a "person entitled to enforce" the Note in order to qualify as a creditor (or creditor's agent) entitled to file a proof of claim. Otherwise, the estate may pay funds to a stranger to the case; indeed, the primary purpose of the real party in interest doctrine is to ensure that such mistaken payments do not occur.

*2. Analysis of the Record and AHMSI's Status as a "Person Entitled to Enforce" the Note*

Here, Shelli Veal apparently signed the Note in Arizona. Given the lack of a choice of law clause in the Note, Arizona law would presumptively govern who has rights to enforce the Note.[41] Under Ari-

---

**40.** See text accompanying note 7, above. In addition, the documents presented, especially the Dorchuck Letter, are subject to a host of evidentiary problems.

**41.** For the purpose of determining who is the real party in interest to enforce the Note, the

forum state's choice of law rules determine which state's substantive law applies. 6A *Federal Practice and Procedure*, at § 1544. Arizona's applicable choice of law statute provides in relevant part that, in the absence of an agreement between the parties, Arizona's

zona's uniform adoption of the UCC, a note's maker has a valid objection to the extent that the claimant is not a "person entitled to enforce" the Note. Ariz.Rev. Stat. Ann. § 47–3301. As stated before, AHMSI presented no evidence as to who possessed the original Note. It also presented no evidence showing indorsement of the note either in its favor or in favor of Wells Fargo, for whom AHMSI allegedly was servicing the Veal Loan. Without establishing these elements, AHMSI cannot establish that it is a "person entitled to enforce" the Note. The Veals would thus have a valid claim objection under § 502(b)(1).

Citing *Campbell*, 336 B.R. at 432, AHMSI essentially argues that the Veals are estopped or have waived their standing arguments. They point to "admissions" in the Veals' bankruptcy schedules and their chapter 13 plan, which both list AHMSI as a secured creditor with a lien on the Property.

We disagree. What these writings evidence is far from clear on this record. In addition to the conclusion AHMSI advances, they might also tend to show: (1) that AHMSI was the current loan servicer, but not a "person entitled to enforce" the Note, (2) that AHMSI was the holder of the Note, (3) that AHMSI was the only entity currently dunning the Veals for payment on the Note, or (4) that someone had highjacked the payment stream, and up until the claims objection, the Veals had been duped.

*Campbell*, on which AHMSI relies, stands for the unremarkable proposition that the bankruptcy court may give evidentiary weight to sworn statements in the debtor's schedules. *Campbell*, 336 B.R. at 436. *Campbell* does not say that a debtor's schedules are necessarily and finally determinative of all facts contained therein. *Id.* This argument may also be an attempt to win an argument not present in this appeal: nothing in the record indicates that the bankruptcy court made any findings of the sort AHMSI asserts based on the contents of the Veals' schedules or plan. Nor is it our role to make such findings.

AHMSI further argues that *Campbell* and *Heath* validate the manner in which it filed its proof of claim, and thus it is entitled to the evidentiary benefits of Rule 3001(f). Rule 3001(f) provides that an otherwise compliant proof of claim is prima facie evidence of the validity and amount of the claim. AHMSI asserts that since its proof of claim met the standards set forth in *Campbell* and *Heath*, the Veals had the burden of production of documents to sustain their objection. As a consequence, according to AHMSI, the Veals' failure to offer any evidence to counter the validity of AHMSI's claim meant that the bankruptcy court could not have erred in overruling the Veals' claim objection.

Neither *Campbell* nor *Heath* dealt with claim objections based on lack of standing. As noted above, standing is an independent threshold issue in all federal civil litigation. *Warth*, 422 U.S. at 498, 95 S.Ct. 2197; *County of Kern*, 581 F.3d at 845. As indicated previously, the plaintiff or movant bears the burden of proof with

version of the UCC applies to transactions "bearing an appropriate relation" to the state of Arizona. Ariz.Rev.Stat. Ann. § 47–1301 (2011). The Veals, who are the makers of the Note, reside in Arizona and apparently executed the Mortgage and the Note in Arizona. (The Mortgage bears a notarial acknowledgment with a Notary's stamp showing that the Notary is commissioned in Maricopa County, Arizona.) These uncontested facts evidence a sufficient relationship with Arizona to justify application of Ariz.Rev.Stat. Ann. § 47–1301. *See Barclays Discount Bank Ltd. v. Levy*, 743 F.2d 722, 724–25 (9th Cir.1984) (applying California's counterpart to Ariz.Rev.Stat. Ann. § 47–1301 under similar circumstances).

respect to its own standing, *see* note 11 *supra*, and AHMSI did not meet that burden here.

 Moreover, under a careful reading of the entirety of Rule 3001, standing is a prerequisite to the evidentiary benefits set forth in Rule 3001(f). On its face, Rule 3001(f) says that a proof of claim is prima facie evidence of the validity and amount of the claim if it is both *executed* and filed in accordance with the Rule, and Rule 3001(b) requires that a claim be executed by the creditor or its authorized agent. Simply put, if a claim is challenged on the basis of standing, the party who filed the proof of claim must show that it is either the creditor or the creditor's authorized agent in order to obtain the benefits of Rule 3001(f). Instead of obviating standing requirements, Rule 3001 conditions the availability of the presumptions contained in Rule 3001(f) upon the creditor first satisfying the standing requirement contained within Rule 3001(b). To hold otherwise would undermine the requirements of both constitutional and prudential standing and the important principles those requirements safeguard.

In sum, the bankruptcy court's order overruling the Veals' claim objection must be vacated and this matter remanded to allow the bankruptcy court to render findings on the disputed factual issues. On remand, the determination of who is the "person entitled to enforce" the Note, and of AHMSI's alleged authorization to service the Veal Loan, may necessitate an evidentiary hearing, but we leave that decision to the bankruptcy court.

## IV. CONCLUSION

For all of the foregoing reasons, the bankruptcy court's order granting Wells Fargo's relief from stay motion is REVERSED, and the order overruling the Veals' claim objection is VACATED and REMANDED for further proceedings consistent with this opinion.