**In re Robert K. SMOAK, Patricia E. Smoak, Debtors.**

**No. 09–30421.**

United States Bankruptcy Court, S.D. Ohio, Western Division, at Dayton.

Sept. 28, 2011.

512

Charles J. Roedersheimer, Lester R. Thompson, Dayton, OH, for Debtors.

**Decision Granting in Part and Denying In Part Debtors' Objection to the Proof of Claim of Ocwen Loan Servicing as Agent for Bank of New York Mellon, as Trustee on Behalf of the Registered Certificateholders of GSAMP Trust 2004 SEA2 Mortgage Pass–Through Certificates, Series 2004—SEA2 Mortgage Services Inc. and Determining that the Claim of Bank of New York Mellon, Trustee Shall be Paid Pursuant to the Terms of the Debtors' Modified Plan**

GUY R. HUMPHREY, Bankruptcy Judge.

## I. Introduction

The mortgage at issue in this proceeding is subject to a pooling and servicing agreement which governs the terms of a securitization trust. The trust relates to certain pooled residential mortgages, and the promissory notes underlying those mortgages. The principal issue to be deter-

mined is the effect of this pooling and servicing agreement upon the standing of an entity in physical possession of a note that is an asset of that trust to enforce it through its proof of claim. Also at issue is the effect of the debtors' modified Chapter 13 plan on the treatment of such a claim. The court determines that Bank of New York Mellon, Trustee, being in physical possession of the note with an affixed endorsement in blank, is the holder of a negotiable instrument under the Ohio Uniform Commercial Code and, therefore, had standing to file a proof of claim and is the real party in interest. The court further determines that this claim is governed by the terms of the debtors' modified Chapter 13 plan.

## II. Procedural and Factual Background

### A. Confirmation of the Smoaks' Chapter 13 Plan and Post–Confirmation Modification of the Plan

Robert and Patricia Smoak filed a Chapter 13 bankruptcy petition and plan (docs. 1 & 7). The Smoaks own a home in a Dayton suburb (the "Property"). The Smoaks scheduled Ocwen Loan Servicing ("Ocwen") as having a claim (the "Claim") secured by the Property; however, the record clarified that Ocwen, as its full name suggests, is only the loan servicer. The Smoaks' Chapter 13 plan proposed to address the Claim through a special plan provision (See doc. 7). According to this provision, the loan was to be paid in full by April 1, 2009 with a balloon payment in the amount of $93,714 due on that date. As the note matured during the time period covered by the Smoaks' Chapter 13 plan, the Smoaks proposed to pay the entire Claim within the time period of their plan.[1]

---

1. 11 U.S.C. § 1322(c)(2) provides that "in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the

To meet this requirement, the Smoaks proposed either to refinance the current obligation or obtain a loan modification and, in the interim, to pay $1,000 each month to the secured claimant once a valid proof of claim was filed. The Chapter 13 plan was confirmed without objection (doc. 20).

Subsequently the Smoaks moved to modify their plan (doc. 57). The modification, among other things, sought to fix the amount of the Claim at $76,000 and set a 10 year amortization schedule for payments within the plan and, consistent with the prior plan, provided for full payment of the Claim within the time period covered by the modified plan. The Smoaks intend to satisfy these requirements by making the monthly amortized payments during the life of the plan until they can obtain a new loan to pay the balance of the Claim.

### B. *Bank of NY Mellon's Claim and the Claim Allowance Process*

"The Bank of New York Mellon, as Trustee on behalf of the registered certificateholders of GSAMP Trust 2004–SEA2, Mortgage Pass–Through Certificates, Series 2004–SEA2" ("Bank of NY Mellon" or "Trustee of the Securitization Trust") filed a proof of claim in the amount of $96,608.65 (Proof of Claim No. 1). The proof of claim was filed as secured and attached a copy of a mortgage (the "Mortgage") and note (the "Note") reflecting Bank One, NA as the lender. Ocwen, as the servicer of the loan, filed the proof of claim and was to collect all the payments (See claim 1–1). The Smoaks objected to

the Claim (docs. 24 & 25), arguing that "[s]ince Creditor's claim references no documents showing either Ocwen or the Creditor as the owner or assignee, the claim must be disallowed under § 502 and Rule 3001(c). Debtors assert that documentation of ownership of the claim is particularly important since the entity listed on the Note, Bank One N.A., has been purchased by another financial entity and Bank of NY Mellon is identified as a securitized trust." Ocwen, on behalf of Bank of NY Mellon, responded only that the proof of claim "is correct in all respects" and attached documentation purportedly showing the ownership of the loan (doc. 30).[2]

The court ultimately held a hearing on the objection to the Claim. Following the hearing on the Claim, the parties entered into a stipulation which, as will be explained, narrowed the dispute to whether noncompliance with the pooling and servicing agreement which governed the securitization trust to which the Note was purportedly transferred affects Bank of NY Mellon's standing and the allowance of the Claim. Before addressing those issues, and in order to place the effect of the pooling and servicing agreement in its proper context, the court will review the timing and circumstances of the original signing of the Note and granting of the Mortgage and the transfer of the Note and Mortgage.

### C. *Assignment of the Claim*

As evidenced by the Note (Exhibit A), on March 8, 1999 the Smoaks borrowed

debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to 1325(a)(5). . . ." For the remainder of this decision, references to Title 11 of the United States Code shall simply refer to "Bankruptcy Code § ___."

2. As this decision explains, for reasons never adequately explained to the court, the documentation needed to establish Bank of NY Mellon as the holder of the Note was not provided by Bank of NY Mellon until 21 months later—after an evidentiary hearing.

$95,125 from Bank One, NA. As security, the Smoaks granted Bank One the Mortgage on the Property (Exhibit B). An allonge dated September 1, 2009 (the "2009 Allonge"), with a listed effective date of July 15, 2004 (Exhibit A): a) reflects that the then present holder of the Note was "THE BANK OF NEW YORK, AS SUCCESSOR TO JP MORGAN CHASE BANK, NATIONAL ASSOCIATION, AS SUCCESSOR–IN INTEREST TO BANK ONE NATIONAL ASSOCIATION, AS TRUSTEE, AKA BANK ONE N.A.;" b) disclaims all interest of The Bank of New York in the Note; and c) pays the Note to the order of "THE BANK OF NEW YORK MELLON, AS TRUSTEE ON BE-HALF OF THE REGISTERED CER-TIFICATEHOLDERS OF GSAMP TRUST 2004–SEA2, MORTGAGE PASS–THROUGH CERTIFICATES, SERIES 2004–SEA2" (the "Securitization Trust"). Thus, the 2009 Allonge reflects that the Note was transferred on three separate occasions: 1) from Bank One N.A. to JP Morgan Chase Bank; 2) from JP Morgan Chase Bank to the The Bank of New York; and ultimately 3) from Bank of New York to Bank of New York Mellon, as Trustee for the Securitization Trust (*See also* Exhibits C, D & E).

The parties agreed at the hearing that Bank One merged with JP Morgan Chase and that the Bank of New York subsequently purchased certain assets from JP Morgan Chase, which included the Note. Additionally, the evidence shows Ocwen had the authority to act as agent to file the proof of claim on behalf of Bank of New York Mellon and to service the loan on behalf of Bank of NY Mellon. *See* Exhibit F. However, the Smoaks have consistently asserted that Bank of NY Mellon, and Ocwen as its servicer, do not have standing and the authority to pursue a claim in their bankruptcy case because: a) the 2009 Allonge does not comply with Ohio's version of the Uniform Commercial Code (the "UCC") codified in Ohio Revised Code Chapter 1301 et seq.; and b) the parties to the pooling and servicing agreement (the "PSA") did not comply with the terms of the PSA.

Subsequent to the evidentiary hearing, the parties stipulated that Bank of NY Mellon is in physical possession of the Note, along with a blank indorsement in the form of an allonge affixed to the note dated March 31, 2004 (the "2004 Allonge") (doc. 94).

### D. *The Pooling and Servicing Agreement*

As noted, the Bank of NY Mellon is the Trustee for the Securitization Trust. For purposes of this decision, a pooling and servicing agreement is an agreement creating a trust that defines the terms under which promissory notes and their related mortgages are placed into the trust, describes how the notes and mortgages and related loan documents are transferred by and between the parties to the trust, and sets forth the various responsibilities of the parties to the trust. The promissory notes, mortgages or deeds of trust, and related loan documents are the trust res. Through the securitization process, the beneficial or ownership interests in the trust are held by investors. *See* Exhibit 1.[3] The Securitization Trust was to include

---

**3.** The PSA is in the form of a prospectus for investors and was filed with the Securities and Exchange Commission. However, regardless of whether the PSA embodied by Exhibit G is considered the complete contract under New York law, the court finds that Bank of NY Mellon, as the Trustee of the Securitization Trust, is the holder of the Note and, as explained later, nothing in Exhibit G changes basic tenants of Ohio UCC law, such as who is the holder of a negotiable instrument. The court makes no findings as to any

primarily 8,226 sub-prime loans aggregating approximately $621,103,282 (Exhibit 1, p. 33 of 274). The PSA represents contractual obligations between the parties to that agreement: Bank One, GSMC (and its affiliate, Goldman Sachs Mortgage Company), Ocwen, and Bank of NY Mellon as the Trustee of the Securitization Trust.

The PSA states that the "mortgage loans" would be purchased from Bank One and Bank One would make "certain representations and warranties relating to the mortgage loans." (Exhibit 1, p. 13 of 274). Under the PSA terminology, Bank One is the "responsible party." (Exhibit 1, p. 35 of 274). The closing date for the Securitization Trust was "on or about June 29, 2004" (Exhibit 1, p. 11 of 274). As of June 30, 2004 Ocwen was to act as the primary servicer for the loans (Exhibit 1, p. 14 of 274). GSMC is the depositor of the mortgage loans. The mortgages were acquired by Goldman Sachs Mortgage Company (which acted as an affiliate for the depositor) from the responsible party, Bank One. The PSA also provides for the transfer of the mortgage loans to encompass various documents including the original note, original mortgage, original or certified copies of guaranties, mortgage assignments and other relevant documents (Exhibit 1, p. 45 of 274). Generally, the PSA provides that if certain documents are not in proper order after review by the Trustee of the Securitization Trust, the responsible party could be required to repurchase a mortgage loan (Exhibit 1, p. 47 of 274).

### E. *The Hearing and Stipulation*

The court held a hearing on the Smoaks' objection to the Claim on April 26, 2011 (doc. 81). At the hearing, the parties stipulated to the admission of the Smoaks' only exhibit, being the PSA (Exhibit 1),

and all of Bank of NY Mellon's exhibits: the Note (Exhibit A); the Mortgage (Exhibit B); the Assignment of the Mortgage from the Bank of New York to the Bank of NY Mellon (Exhibit C); the Agreement of Merger between Bank One and JP Morgan Chase Bank (Exhibit D); a Form 8–K relating to a set of transactions between Bank of New York and JP Morgan Chase completed on October 1, 2006 (Exhibit E); and the power of attorney granting Ocwen authority to act as the agent for Bank of NY Mellon (Exhibit F). All of these documents were admitted into evidence. The remainder of the hearing consisted of counsels' argument concerning the legal effect of the documents which were admitted.

Following the hearing, the parties stipulated that Bank of NY Mellon "is in physical possession of the subject mortgage note as a holder of said note pursuant to the blank indorsement contained in the allonge affixed to said note" and reserved for determination the issue of "the applicability of the Pooling and Servicing Agreement ("PSA") and any effect said PSA may or may not have regarding Creditor's legal entitlement to enforce the Note as a secured or unsecured claim" (doc. 94). Following the filing of the stipulation, the court took the matter under advisement.

### III. Legal Conclusions

#### A. *Jurisdiction and Venue*

This court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O). Venue of the contested matter has not been contested.

#### B. *Standard of Review*

 With certain exceptions not relevant, Bankruptcy Code § 502(b)(1) states

---

specific section of Exhibit G beyond the legal conclusion that no provision of the PSA

changes who the holder of the Note is under Ohio's version of the UCC.

that a claim may not be allowed if "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]" Bankruptcy Rule 3001(f) provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." A party objecting to a claim filed in compliance with Bankruptcy Rule 3001 and Official Form 10 has the initial burden of production or "going forward." *In re Burkett*, 329 B.R. 820, 826–27 (Bankr. S.D.Ohio 2005). In all circumstances, the creditor retains the ultimate burden of persuasion as to the validity of its claim. *Id.* at 827.

### C. *Analysis*
#### 1. *The Holder of the Note Under the UCC is the Real Party in Interest*

■ Federal Rule of Civil Procedure 17, which is applicable to this contested matter through Bankruptcy Rules 7017 and 9014(c), requires the real party in interest to file a proof of claim. *See Veal v. Amer. Home Mtge. Servicing, Inc. (In re Veal)*, 450 B.R. 897, 907 (9th Cir. BAP 2011); *In re Hwang*, 438 B.R. 661, 665 (C.D.Cal.2010). The real party in interest with respect to a mortgage proof of claim and enforcement of the rights of a mort-gagee in a bankruptcy is the party entitled to enforce the note and its accompanying mortgage. *In re Agard*, 444 B.R. 231, 245 (Bankr.E.D.N.Y.2011); *Hwang*, 438 B.R. at 665. In order to determine the real party in interest, the court must look to applicable non-bankruptcy law, in this instance Ohio law, because bankruptcy law does not address the enforcement of promissory notes. *See Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136(1979); *Nuvell Credit Corp. v. Westfall (In re Westfall)*, 599 F.3d 498, 502 (6th Cir.2010).

■ Under Ohio law, the holder of a negotiable instrument, including a promissory note, has the right to enforce it. Ohio Revised Code § 1303.31(A)(1) [UCC 3–301]; *In re Foreclosure Cases*, 521 F.Supp.2d 650, 653 (S.D.Ohio 2007); *Nat'l City Mtge. Co. v. Piccirilli*, 2011 WL 3819795 (Ohio Ct.App. Aug. 24, 2011).[4] *See also Hwang*, 438 B.R. at 665 (holder of a negotiable instrument is the real party in interest under California law). Ohio Revised Code § 1301.01(T)(1) [UCC 1–201][5] defined "holder" with respect to a negotiable instrument as either: a) a person in possession of the instrument If the instrument is payable to bearer; or b) the person identified in the instrument when that person is in possession of the instrument if the instrument is payable to an identified person.[6] Through the blank endorsement,

4. Under the UCC, it is not always necessary to be the holder of the note in order to have the right to enforce it, but the court need not address those issues. *See* Ohio Revised Code § 1303.31 (Person entitled to enforce an instrument). *See also Veal v. Amer. Home Mtge. Servicing, Inc. (In re Veal)*, 450 B.R. 897, 911, n. 22 (9th Cir. BAP 2011) (describing the limited circumstances under which a non-holder may enforce a negotiable instrument).

5. Effective June 29, 2011, Ohio Revised Code 1301.01 was re-codified in Ohio Revised Code § 1301.201. Ohio Revised Code

§ 1301.01(T)(1) is now codified at Ohio Revised Code § 1301.201(B)(21). The substantive changes to the definition of holder concern documents of title and would not have impacted this decision.

6. Ohio Revised Code § 1301.201(B)(5) [UCC 1–201], effective June 29, 2011, was part of the amendments and recodifying of Ohio Revised Code § 1301.01, which specifies that the instrument must be a negotiable instrument. The change is not substantive because Ohio Revised Code § 1303.03(B) [UCC 3–104] defines "instrument" to mean "negotiable in-

the Note became bearer paper.[7] Bank of NY Mellon is the holder of the Note as Trustee for the Securitization Trust because it holds the original note and an endorsement, not to a particular person or entity, but instead in blank. *Densmore v. Litton Loan Servicing, L.P. (In re Densmore)*, 445 B.R. 307, 310 (Bankr.D.Vt. 2011), *citing In re Samuels*, 415 B.R. 8, 20 (Bankr.D.Mass.2009) (Possession of the note with a blank endorsement creates standing because the bank was the holder); *Wilson v. Countrywide Home Loans, Inc. (In re Wilson)*, 442 B.R. 10, 15 (Bankr. D.Mass.2010) ("By virtue of its possession of a note indorsed in blank, Deutsche Bank is the holder of the note."). In addition, Ocwen can enforce the note because it acts as the agent for the Bank of New York Mellon. *See* Exhibit F. As the holder, for all the reasons explained, Bank of NY Mellon is the real party in interest.[8]

█ The Smoaks raise concern as to their payments on the Note going to the wrong entity and because "[a]ny challenge by an investor in the Trust assets will impinge or place a cloud on title as to the mortgage deed ..." and, therefore,

"[t]heir rights will be affected by noncompliance by the parties identified as having responsibilities and duties under the Trust." *Brief of Robert K. and Patricia E. Smoak for Objection Hearing* (doc. 93), pp. 4–5. However, because it has been established that Bank of NY Mellon is the holder of the Note, the Smoaks, as the maker of the Note,[9] need not be concerned with who the owner of the Note is, but only that the payments are being delivered to a person with the right to enforce the Note. *See Kemp v. Countrywide Home Loans, Inc. (In re Kemp)*, 440 B.R. 624, 631 (Bankr.D.N.J.2010), *quoting Adams v. Madison Realty & Dev. Inc.*, 853 F.2d 163, 166 (3rd Cir.1988) ("From the maker's standpoint, therefore, it becomes essential to establish that the person who demands payment of a negotiable note, or to whom payment is made, is the duly qualified holder.... Consequently, plaintiffs here, as makers of the notes, may properly press defendant to establish its holder status."). *See also Livonia Properties Holdings, L.L.C. v. 12840–12976 Farmington Road Holdings, L.L.C.*, 399 Fed.Appx. 97, 102, 2010 WL 4275305, at *4 (6th Cir.2010) ("Livonia is not at risk of paying the debt

strument." The Smoaks do not argue that the Note is not a negotiable instrument. *See also* Ohio Revised Code § 1303.03(A) for the definition of a negotiable instrument.

7. Ohio Revised Code § 1303.25(B) [UCC 3–205] defines a blank indorsement as "an indorsement that is made by the holder of the instrument and that is not is not a special indorsement." A special indorsement "means an indorsement that is made by the holder of an instrument, whether payable to an identified person payable to bearer, and that identifies a person to whom it makes the instrument pay[a]ble *sic*. An instrument, when specially indorsed, becomes payable to the identified person and may be negotiated only by the indorsement of that person." Ohio Revised Code § 1303.25(A). *See also* Ohio Revised Code § 1303.10(D) ("An instrument payable to an identified person may

become payable to bearer if it is indorsed in blank pursuant to [1303.25(A)].").

8. Under these facts, the court need not consider any potential defects in the 2009 Allonge. For instance, the Smoaks, among other things, raise the issue of the 2009 Allonge being post-dated. That issue is moot and the court expresses no opinion on the question or any other issues related to the 2009 Allonge. The 2004 Allonge, dated March 31, 2004, and affixed to the Note, proves that the Bank of New York Mellon, as Trustee of the Securitization Trust, is a person entitled to enforce the note because, under the Ohio UCC, it is the holder of the Note.

9. " 'Maker' means a person who signs or is identified in a note as a person undertaking to pay." Ohio Revised Code § 1303.01(A)(7) [UCC 3–103].

twice" because the creditor has established rights to the note based on possession and a proper chain of assignment). Through the payments made to Ocwen as the established agent of Bank of NY Mellon, pursuant to the binding effect of the modified Chapter 13 plan, the Smoaks can be assured the payments will be applied to their obligations under the Note. *See Veal,* 450 B.R. at 910 ("[I]f a maker makes a payment to a 'person entitled to enforce', the obligation is satisfied on a dollar for dollar basis, and the maker never has to pay that amount again."). The UCC and Ohio law interpreting the UCC require this result.

**2.** *Because Bank of New York Mellon is the Holder of the Note and the Mortgage is an Incident of the Note, the Smoaks Have No Basis to Question the Transfers Provided by the PSA or the Mortgage Assignment*

█ While the Smoaks assert that Bank of NY Mellon does not have standing as the Trustee of the Securitization Trust to enforce the Note because the terms of the PSA were not complied with, the PSA does not change that Bank of New York Mellon is the holder of the note under the Ohio UCC. The arguments made by the Smoaks that noncompliance with the PSA vitiates the standing of lenders to enforce notes and mortgages have been made by other debtors and rejected. In *Correia v. Deutsche Bank Nat'l Trust Co. (In re Correia),* 452 B.R. 319 (1st Cir. BAP 2011), the court affirmed the bankruptcy court's determination that the debtors lacked standing to raise violations of the pooling and servicing agreement involved in that case, and following *In re Almeida,* 417 B.R. 140, 149 n. 4 (Bankr.D.Mass.2009), the court held that the debtors, as makers

of the notes, were not parties or third-party beneficiaries to the pooling and servicing agreement and, therefore, lacked standing. *See also Bittinger v. Wells Fargo Bank NA,* 744 F.Supp.2d 619, 625–26 (S.D.Tex.2010) (obligor cannot sue for breach of contract based upon a pooling and servicing agreement to which it is not a party) and *Livonia Property Holdings, L.L.C. v. 12840–12976 Farmington Road Holdings, L.L.C.,* 717 F.Supp.2d 724, 748 (E.D.Mich.2010), *aff'd* 399 Fed.Appx. 97 (6th Cir.2010) (similar). Based upon the undisputed facts of this contested matter, the PSA does not relate to who is the "person entitled to enforce" the Note under the Ohio UCC.

█ In addition, the Smoaks cannot attack the transfer of the Mortgage because, under long established Ohio law, a mortgage is an incident of the underlying debt, in this instance the Note. *Gemini Svcs., Inc. v. Mortgage Elec. Regis. Sys., Inc. (In re Gemini Svcs., Inc.),* 350 B.R. 74, 82 (Bankr.S.D.Ohio 2006); *U.S. Bank Nat'l Ass'n v. Marcino,* 181 Ohio App.3d 328, 908 N.E.2d 1032, 1038 (2009). As the makers of the Note, the Smoaks cannot challenge the security for the Note based on a defect in its assignment, as long as the holder has provided evidence that the makers granted the Mortgage to secure the obligations owed on the Note. *See Noland v. Wells Fargo Bank N.A. (In re Williams),* 395 B.R. 33, 44 (Bankr. S.D.Ohio 2008) (defects in assignments of a mortgage may affect subsequent bona fide purchasers of the mortgage, but not the original mortgagor). Bank of NY Mellon has provided such evidence and the Smoaks have not disputed it. *See* Exhibit B (Mortgage on the Property granted to Bank One NA by the Smoaks).[10]

---

**10.** The Smoaks also argue (doc. 78, n. 2) that Bank of NY Mellon failed to comply with Ohio Revised Code § 5309.65 which states:

Before an assignee or trustee for the benefit of creditors, receiver, master commissioner, special master commissioner, executor, or

### 3. Noncompliance With the PSA Does Not Affect the Right of the Holder of the Note to Enforce the Note Against the Makers

 Even if the Smoaks had standing to raise issues pertaining to noncompliance with the PSA, noncompliance with the PSA does not affect a holder's ability to enforce a promissory note against the maker of the note or deprive the holder from having standing in a bankruptcy case to file a proof of claim and collect on it. The Smoaks argue that the parties to the PSA which governs the Securitization Trust did not comply with the contractual terms of the PSA and, therefore, the Note was never properly transferred to the Securitization Trust or to the Securitization Trustee.[11] Accordingly, the Smoaks argue that the Bank of NY Mellon cannot take any action with respect to the Note because the Note is not an asset of the Securitization Trust. In making this argument, the Smoaks have asserted that the parties to the PSA have varied the effect of the UCC and altered or eliminated the rights of a holder under UCC 1–102(3) [Ohio Revised Code § 1301.02(C)]. *See Debtors Robert K. And Patricia E. Smoak Brief In Response To Brief Of The Bank Of New York Mellon*, p. 3, n. 1. The court disagrees.

Parties to transactions governed by the UCC can agree to vary the effect of some provisions of the UCC. Thus, Ohio Revised Code § 1301.02(C) [UCC 1–102(3)][12] pro-

---

other person appointed by a court, shall deal with or transfer registered land, or any interest therein, such person shall file in the county recorder's office a certified copy of the deed, order of the court, will, or other authority showing that such person is authorized to deal with or transfer such land or interest, and shall present to the recorder the duplicate certificate of title for such land. The recorder shall enter upon the registered certificate and on the duplicate certificate of title, a memorial thereof, with a reference to such deed, order of the court, will, or other authority by its file number. In case of a deed of the land in fee simple to the assignee, receiver, or other officer, the recorder shall register the title in the name of such transferee and issue to him a certificate of title, stating therein the purpose for which the land was transferred to him. However, this section only addresses the transfers of registered land, or an interest in registered land, and not generally to encumbrances upon real property. Further, the Smoaks fail to explain how the Property is "registered land." See Ohio Revised Code § 5309.01(D) (" 'registered land' means any land registered under this chapter or Chapter 5310. of the Revised Code.") The court finds that this section of the Ohio Revised Code is not applicable.

**11.** *See Brief of Robert K. and Patricia E. Smoak for Objection Hearing* (Doc. 93, p. 4): "Documents offered to the Court by the Creditor to date certainly cast doubt on the validity of Creditors claim of ownership given the absence of compliant transfer of chain of title and endorsement as to the Note and Mortgage." *See also Debtors Robert K. And Patricia E. Smoak Brief In Response To Brief Of The Bank Of New York Mellon*, p. 2 (Doc. 78, p. 2): "Ocwen as the servicer of the Trust, and the Trust itself, are required to adhere to prescribed criteria under the methods, under the pooling and servicing agreement ("PSA") to accomplish any endorsement and transfers of the note or assignments of the mortgage deed into the Trust. Neither the Trust nor Ocwen have complied with these PSA provisions."

**12.** Effective June 29, 2011, Ohio Revised Code § 1301.02(C) was re-codified as § 1301.302(A) & (B) and non-substantive changes to the language were made. It now reads:

"(A) Except as otherwise provided in division (B) of this section or elsewhere in Chapter 1301., 1303., 1304., 1305., 1307., 1308., 1309., or 1310. of the Revised Code, the effect of provisions of Chapters 1301., 1303., 1304., 1305., 1307., 1308., 1309., and 1310. of the Revised Code may be varied by agreement.
(B) The obligations of good faith, diligence, reasonableness, and care prescribed by Chapter 1301., 1302., 1303., 1304., 1305., 1307., 1308., 1309., or 1310. of the Revised Code may not be disclaimed by agreement.

vided that "[t]he effect of the provisions of Chapters 1301., 1302., 1303., 1304., 1305., 1307., 1308., 1309., and 1310. of the Ohio Revised Code may be varied by agreement, except as otherwise provided in those chapters and except that the obligations of good faith, diligence, reasonableness, and care prescribed by those chapters may not be disclaimed by agreement, but the parties by agreement may determine the standards by which the performance of those obligations is to be measured if the standards are not manifestly unreasonable."

However, the PSA does not and could not vary the essential rules and terminology of the transfer of negotiable instruments to establish the "person entitled to enforce." *See* Official Comment 2 to UCC 1–102:

> 1. Subsection (a) states affirmatively at the outset that freedom of contract is a principle of the Uniform Commercial Code: "the effect" of its provisions may be varied by "agreement." **The meaning of the statute itself must be found in its text, including its definitions, and in appropriate extrinsic aids; it cannot be varied by agreement.** But the Uniform Commercial Code seeks to avoid the type of interference with evolutionary growth found in pre-Code cases such as *Manhattan Co. v. Morgan*, 242 N.Y. 38, 150 N.E. 594 (1926). **Thus, private parties cannot make an instrument negotiable within the meaning of Article 3 except as provided in Section 3–104; nor can they change the** **meaning of such terms as "bona fide purchaser," "holder in due course," or "due negotiation," as used in the Uniform Commercial Code. But an agreement can change the legal consequences that would otherwise flow from the provisions of the Uniform Commercial Code.** "Agreement" here includes the effect given to course of dealing, usage of trade and course of performance by Sections 1–201 and 1–303; the effect of an agreement on the rights of third parties is left to specific provisions of the Uniform Commercial Code and to supplementary principles applicable under Section 1–103. The rights of third parties under Section 9–317 when a security interest is unperfected, for example, cannot be destroyed by a clause in the security agreement.

Ohio Revised Code § 1301.02(C) (re-codified in Ohio Revised Code 1301.302 (Official Comment 1)) (emphasis added). For example, in interpreting Ohio law, a bankruptcy court determined that Ohio Revised Code § 1301.02 did not permit a party to change the definition of a security interest. *In re Homeplace Stores, Inc.*, 228 B.R. 88, 94 (Bankr.D.Del.1998). Similarly, the PSA does not change who the holder (or other person entitled to enforce) the Note is under Ohio's version of the UCC. Instead, the PSA generally seeks to govern, among many other details, the effect of certain provisions of commercial law and to create certain supplemental obligations between the parties to it.

> The parties, by agreement, may determine the standards by which the performance of those obligations is to be measured if those standards are not manifestly unreasonable. Whenever Chapter 1301., 1302., 1303., 1304., 1305., 1307., 1308., 1309., or 1310. of the Revised Code requires an action to be taken within a reasonable time, a time that is not manifestly unreasonable may be fixed by agreement."

Ohio Revised Code § 1301.302(A) & (B). Although some recent changes to Ohio UCC law are substantive, all the changes noted to various subsections to the Ohio UCC cited in this decision are not substantive. In any event, the changes only apply to transactions entered on or after the bill's effective date of June 29, 2011. *See* Ohio 2011 Am. H.B. 9, Section 3.

■ Further, the Smoaks' argument confuses the rights of an owner of a promissory note or one who holds interests in a promissory note with the rights of a holder of a note. Their argument suggests that in order to prove standing to file and enforce a proof of claim relating to a securitized mortgage note, a creditor must establish that it is the owner of the note— not the holder of the note. However, as noted, under Ohio law, it is the holder of a promissory note who may enforce it and who, therefore, has standing to file a proof of claim.[13] Of course, it may be, upon different facts, that a securitization trust trustee, or similar entity, may not be entitled to enforce a note as the holder or other "person entitled to enforce" under the Ohio UCC. However, the Smoaks' argument does not challenge the holder status of the Trustee of the Securitization Trust.

The holder status of the Trustee of the Securitization Trust is established by Article 3 of the UCC, as codified in Ohio. Article 3, by establishing the "person entitled to enforce" the Note, addresses the proper person to be paid. *Veal,* 450 B.R. at 909. To the extent the Smoaks are arguing Article 9 of the UCC should apply, Article 9 generally addresses who owns or has other property interests in a negotiable instrument. *Id.* at 909–10.[14] This decision does not address the role of Article 9 in ownership status and how such law may interact with the PSA. *See id* at 912–13 (extended discussion of Article 9 and ownership rights in promissory notes). The significance for this decision is that Article 3, rather than Article 9, creates the holder rights of Bank of New York Mellon and ultimately gives it standing as a real party in interest.

In short, even if the assignments and transfers failed to comply with the terms of the PSA, the result is not any different under these facts. The owner of the Note (if it is different than the holder) is not a real party in interest because its rights, if any, would be against a holder or other third party in violation of a contract, not the maker. *Hwang,* 438 B.R. at 667. Under Rule 19, the owner's rights are not impaired by its inability to protect its interest by filing a proof of claim because it lacks the authority to collect under the Note. *See* Federal Rule of Civil Procedure 19(a)(1)(B)(i) (applicable by Bankruptcy Rules 7019 and 9014(c)).[15] *See also Kemp,* 440 B.R. at 633 ("The attempted assignment of the note in the assignment of mortgage document, together with the terms of the Pooling and Servicing Agreement, created an ownership issue, but did

---

**13.** The Smoaks assert the PSA is governed by New York trust law. The court has no reason to dispute that assertion and it does not appear that Bank of NY Mellon disputes it. However, Ohio UCC law establishes standing and the real party in interest and the Note and Mortgage are governed by Ohio law. None of the cases cited by the Smoaks change this result. In *Doble v. Deutsche Bank Nat'l Trust Co. (In re Doble),* 2011 WL 1465559 (Bankr.S.D.Cal. April 14, 2011), cited by the Smoaks, that court found New York trust law did not apply to real estate investment trusts. The court does not express an opinion as to that conclusion; however, as to the relevance of the PSA in that case to standing, nothing in the decision contradicts this court's narrow

finding that a valid blank endorsement of a negotiable instrument provides the holder with standing to file a proof of claim as the real party in interest. Nor do the other cases cited in the Smoaks' brief (doc. 93) alter this court's conclusion.

**14.** UCC § 9–109(a)(3) provides that Article 9 "applies to … a sale of … promissory notes."

**15.** *See* Ohio Revised Code § 1303.31(B) [UCC 3–301] ("A person may be a 'person entitled to enforce' the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument.").

not transfer the right to enforce the note."). The PSA may establish ownership, but does not define the holder or other "person entitled to enforce" the Note under the Ohio UCC.

The court does not conclude that the status as an owner of a note (or the holding of other interests in a note or in a securitized trust) may never provide standing or that breaches of a pooling and servicing agreement will never be dispositive of the determination of an action, adversary proceeding, or contested matter. Of course, issues as to who may be entitled, under a separate contract, to ultimately receive the mortgage payments collected by the holder of the note, whether recourse obligations between the parties to the pooling and servicing agreement were triggered by the breach of the agreement, and a myriad of other questions relating to a pooling and servicing agreement, securitized trust, and the notes and mortgages could arise. However, the arguments of the Debtors neither require an analysis of any possible error in the transfer of the note to the PSA nor establish their standing under these facts to raise them.[16]

### 4. *The Smoaks' Modified Plan Determined the Allowed Amount and the Treatment of Bank of NY Mellon's Claim*

Another issue is the amount of the Claim and its treatment. For the reasons that follow, the court determines that the allowed amount and the treatment of Bank

of NY Mellon's claim as Trustee of the Securitization Trust shall be as provided by the Smoaks' modified plan.

Ocwen filed a secured proof of claim on behalf of Bank of NY Mellon as the Trustee of the Securitization Trust in the amount of $96,608.65. Proof of Claim 1. The Smoaks filed an objection to that claim, contending that Ocwen had not established standing and that since the mortgage note became due during the Smoaks' plan period, they could modify the claim both to reduce the interest rate and to reduce the claim to its present value (doc. 25). The Smoaks later filed a motion to modify their confirmed plan (doc. 57). The text of the motion, in pertinent part, states:

> This Motion is made pursuant to terms set forth in their Plan for Real Estate for their home and residence at 24 Mario Drive, Trotwood, Ohio 45427 ("Property") for a mortgage loan ("Loan") due and payable to Creditor Ocwen Mortgage Services, as agent for Bank of New York Mellon, Trustee, on behalf of Registered Certificate Holder GSAMP Trust 2004–SEA2 to Mortgage Pass Through Certificate Series SEA2–2004 ("Ocwen"). The Motion also resolves the Debtors objection to Ocwen's secured claim (Claim Register 1) in the amount of $96,608.65 which Loan reached maturity date on March 12, 2009 approximately 42 days **after** Debt-

---

**16.** For example, one could assume for argument's sake that the Note could be returned to the "responsible party" for failure to comply with the PSA, and the holder of the Note—at some undetermined future date—could change. However, from the Smoaks' perspective, all previous payments to the prior holder would reduce the balance on the Note and the secured claim of Bank of NY Mellon and payments would then be owed to the current holder. If the Smoaks had shown that the Note, with the endorsement in blank,

had been transferred from the Trustee to the responsible party's assignee, or some other entity, that transferee would become the holder. No such evidence was introduced and nothing in the record suggests that ever occurred. While the court is mindful that the "real world" reality of the Smoaks being assured the holder is receiving the payments may be more complicated to implement in practice, the protection of the Smoaks under the UCC is to pay the holder of the Note, whoever that may be at any given time.

ors bankruptcy petition filing date. Debtors modified plan will provide for full payment of Ocwen's claim within the length of their plan through a combination of monthly payments and a refinancing prior to the expiration of the modified plan.

*Motion for Modification of Plan,* p. 1 (doc. 57) (bold in original). The Memorandum In Support of the motion further provided, in pertinent part:

2. ... Debtors, pursuant to the provisions of 11 U.S.C. § 1322(c) and § 1325(a)(5), will provide for monthly mortgage payments to Ocwen by treating the Loan as matured with a monthly payment based on the applicable Plan interest rate and a projected maturization date for a ten year note with an origination date of the petition filing date of January 29, 2009. Present valuation for the Property will be the appraised value of $76,000. ...

3. The effective date of the loan modification will be April 1, 2010.

4. The funds currently held by the Trustee based upon the pending objection of Debtors to Creditor's claim will be paid based upon the revised amortized loan payment schedule as set forth in this modified plan.

\* \* \* \*

Based upon the above, the Debtors' Plan is modified as follows:

### Special Plan for Real Estate

Debtors' residence at 24 Mario Drive, Trotwood, Ohio 45426 ("Property"), currently is encumbered by a secured loan and mortgage ("Note") serviced by Ocwen Mortgage Services, Inc. for Bank of New York Mellon, Trustee, on behalf of Registered Certificate Holder GSAMP Trust 2004–SEA2 to Mortgage Pass Through Certificate Series SEA2–2004 ("Ocwen"). The Note matured on March 12, 2009 and pursuant to 11 U.S.C. §§ 1322(c) and 1325(a)(5) will be fully paid within the term of Debtor's Plan as a Matured Note. Debtors' monthly payments to Ocwen and any subsequent assignee of the claim on the Matured Note will be $796.84. The Matured Note payment will be calculated by applying the applicable Plan interest rate to the present valuation for the Note of $76,000 as determined by the appraised Property value listed in Debtors' confirmed Plan. The allocation of principal and interest Matured Note payments will be calculated based on an amortization schedule for a ten year note with the origination date being the petition filing date of January 29, 2009. Debtors will arrange for full payment of the Matured Note within the modified term of the Plan by refinancing the Matured Note prior to the completion date of the modified Plan. The balance of the Note owed at the time of the refinancing will be determined by the balance due on the Matured Note as of the date of refinancing. For purposes of calculating the balance due for refinancing, an amortization schedule is attached as Exhibit A to apportion the Debtors' monthly payments as to interest and principal of the Matured Note for payments under the modified plan. Debtors shall obtain authorization from the Trustee or the Court before entering into any refinance agreement.

Funds currently held by the Trustee due to Debtors' objection to Creditor Ocwen's claim will be paid to Ocwen pursuant to Mature Note terms and amortization schedule as set forth in the preceding paragraph for monthly payments due on the Note on or after January 29, 2009[.]

*Motion for Modification of Plan,* p. 2 (doc. 57) (bold in original). Further, attached as Exhibit A to the motion is an amortization table that contains a monthly amortization of the loan, as proposed to be modified through the motion and states: "Loan Amount: **$76,000** ~ Term of the Loan: **10 years** ~ Interest Rate: **4.750%**; Monthly mortgage payments: **$796.84** ~ Total interest paid over the life of the loan: **$19,-621.14.**" The loan balance after the first payment, February 1, 2009, under that table is stated as "**75,503.99.**" See doc. 57 (bold in original).

No objection to the motion to modify the plan was filed and the court entered an order approving the modification. In its hearing brief (doc. 77), Bank of NY Mellon argues that the Smoaks' modification is ambiguous because the first page of the motion refers to "full payment" of Bank of NY Mellon's claim while paragraph 2 of the Memorandum in Support provides for reduction of the claim from $96,608.65 to $76,000. The brief further states that:

> In addition, the "Special Plan for Real Estate" contained in the Motion for Modification provides that "[d]ebtors will arrange for full payment of the Matured Note within the modified term of the Plan by refinancing the Matured Note prior to the completion date of the modified". See Special Plan for Real Estate in Motion for Modification. Again, the plan speaks to "full payment" of the Matured Note, and the Motion for Modification continues to state "[t]he balance of the Note owed at the time of the refinancing will be determined by the balance due on the Matured Note as of the date of refinancing". It is axiomatic black letter law that these conflicting terms should be construed against the drafter of the plan. Thus, Creditor's claim should be paid in full as filed.

(doc. 77, p. 9). Thus, Bank of NY Mellon argues that the plan modification is ambiguous because it uses contradictory language, both saying that the claim will be "paid in full" and stating that the claim will be reduced to $76,000 and that this ambiguity must be resolved against the Smoaks as the drafters and proponents of the modification.

■ First, the court finds that the modification is not ambiguous. Upon review of the entirety of the modified plan, the court finds the confirmed modification determined that the secured claim of Bank of NY Mellon to be $76,000; set a 10 year amortization schedule, including interest; required payments during the plan of $796.84 each month and provided the entire secured claim would be paid in full during the plan by refinancing the obligation to Bank of NY Mellon. The language of the Memorandum in Support and the amortization schedule attached as Exhibit A to the motion clearly set forth that the claim would be $76,000, not as filed in the amount of $96,608.65, and amortized over a ten year period.

■ Second, even if the modification was ambiguous, it was incumbent upon Bank of NY Mellon to object to the modification and to raise any such ambiguity or questions or concerns that it had concerning the terms of the proposed modification at that time so that any such ambiguity could be timely resolved. As this court noted in *In re McLemore,* 426 B.R. 728, 737 (Bankr.S.D.Ohio 2010), issues as to vagueness or ambiguity of a plan must be raised at the confirmation stage. Such issues cannot be raised later after the plan or modification has become binding under Bankruptcy Code §§ 1327 and 1329. *See also United Student Aid Funds, Inc. v. Espinosa,* —— U.S. ——, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010); *In re Harvey,* 213 F.3d 318, 322 (7th Cir.2000) and *In re*

*Averhart,* 372 B.R. 441, 445–46 (Bankr. E.D.Wisc.2007).

█ As a final note, the amount of a creditor's claim ordinarily would be addressed and resolved through the claims allowance process and not through the Chapter 13 plan confirmation process. However, the Smoaks' loan matured during the plan period and the Smoaks sought to provide different treatment to that claim pursuant to Bankruptcy Code § 1322(c)(2) and there is no dispute that Ocwen and Bank of NY Mellon received adequate notice of the modification motion. Under these particular facts, the mechanism of using the plan modification to resolve the amount of Bank of NY Mellon's claim along with the other terms of the loan and claim is not offensive to procedural due process. See *McLemore,* 426 B.R. at 741–42 and *In re Hudson,* 260 B.R. 421, 430–31 (Bankr.W.D.Mich.2001) (secured creditor must object to plan treatment and filed proof of claim cannot serve as substitute for objecting to treatment under a plan). *See also Espinosa,* 130 S.Ct. at 1380 (creditor cannot use Federal Rule of Civil Procedure 60(b)(4) to vacate a confirmation order when it failed to object to a properly noticed plan). Ordinarily, absent Bankruptcy Code § 1322(c)(2), this claim, as a secured claim on the primary residence, would not be allowed to be modified under Bankruptcy Code § 1322(b)(2). In short, the fundamental issue in the modified plan was not the amount of the claim, but altering the treatment of the claim.

For these reasons, the court finds that the Smoaks' treatment of Bank of NY Mellon's claim provided in their modified plan is binding on Bank of NY Mellon. Bank of NY Mellon, as the Trustee of the Securitization Trust, shall be paid $76,000, based upon an amortization over 10 years, at an interest rate of 4.750%, with a monthly mortgage payment of $796.84, un-til the unpaid principal balance, as modified under the plan, is paid in full prior to the completion date of the Smoaks' modified plan through refinancing or otherwise.

## IV. Conclusion

The proof of claim filed by Ocwen on behalf of Bank of New York Mellon as the Trustee of the Securitization Trust (1–1) did not have the necessary documentation to show standing and was not entitled to prima facie validity pursuant to Bankruptcy Rule 3001. The Smoaks met their initial burden of production to challenge the allowance of the Claim. However, through the belated stipulation concerning the Note and the Allonge, Bank of New York Mellon has met its ultimate burden of persuasion to establish standing as the real party in interest. Therefore, the objection of the Smoaks to the proof of claim of Bank of New York Mellon as relates to the standing of Bank of New York Mellon is **denied.** Bank of New York Mellon, the Trustee for the Securitization Trust, is the real party in interest and has a secured claim in the amount of $76,000, and Ocwen, as the recognized servicer for Bank of New York Mellon, Trustee of the Securitization Trust, is to be paid as detailed in the Smoaks' modified Chapter 13 plan. The court will issue an order contemporaneously with this decision.