FILED

NOT FOR PUBLICATION

AUG 25 2015

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

## UNITED STATES BANKRUPTCY APPELLATE PANEL

### OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No.   CC-14-1314-TaKuD |
| ) | |
| JOEL WERNER and ) | Bk. No.   8:08-bk-11153-RK* |
| CATHLEEN WERNER, ) | |
| ) | Adv. No.   8:10-ap-01104-CB |
| Debtors. ) | |
| _____ ) | |
| ) | |
| JASON SCOTT WICKAM, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **MEMORANDUM**** |
| ) | |
| DEBORAH IVAR; ALAN IVAR; ) | |
| DAVID ROCHE, ) | |
| ) | |
| Appellees. ) | |
| _____ ) | |

Argued and Submitted on June 18, 2015
at Pasadena, California

Filed - August 25, 2015

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Catherine E. Bauer, Bankruptcy Judge, Presiding

_____

* The bankruptcy court consolidated four related adversary proceedings; the lead was designated as 08:08-ap-01241-RK, RSD Group Inc., et al. v. Werner (In re Werner). As a result, the Werner bankruptcy case is designated as the bankruptcy case on appeal, although neither Joel Werner nor Cathleen Werner are parties to the appeal.

** This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1(c)(2).

Appearances:    Robert R. Anderson argued for appellant; Michael John Carras of Conforti & Carras argued for appellees.

Before:  TAYLOR, DUNN, and KURTZ, Bankruptcy Judges.

## INTRODUCTION

In an adversary proceeding commenced against debtor Jason Scott Wickam, plaintiffs Alan Ivar, Deborah Ivar, and David Roche alleged that the Debtor made misrepresentations and fraudulently concealed material information, which induced them to invest in an ultimately unsuccessful real estate development project. The Ivars and Roche sought a determination from the bankruptcy court that their particular investments were nondischargeable under § 523(a)(2)(A).[1] After trial, the bankruptcy court entered a judgment in favor of the Ivars and Roche, determining the amount of $1,016,000 (plus post-judgment interest) nondischargeable.

As to the judgment, we conclude that the bankruptcy court did not make sufficient or complete findings with respect to each investment and each element of § 523(a)(2)(A). Therefore, we VACATE the judgment and REMAND to the bankruptcy court with instructions that it make additional findings. The Debtor also argues that, in contravention of § 523(a)(2)(A), the bankruptcy court improperly relied on statements relating to his financial condition. We disagree and AFFIRM the bankruptcy court in this

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

regard.

**FACTS**

In 2005, the Debtor and Joel Werner formed Connexian Investments, Inc. for the purposes of developing, selling, and marketing high-end "spec" homes in Southern California and Colorado. Connexian's first project was Coral Blue, the construction and development of four lots (the "Properties") in Southern California (the "Coral Blue Project"). In early 2006, it contracted to purchase the Properties for $3,825,000. But, it lacked the funds necessary to complete the purchase and obtained extensions to close escrow.

The Debtor and Werner also formed Coral Blue, LLC, specifically for the Coral Blue Project. And Connexian retained RSD Group, Inc. to raise equity capital and financing for the project. Through RSD, Connexian pursued potential financing from Point Center Financial, a self-described "hard money lender."

Eventually, Point Center loaned Connexian $6,587,100 to fund the purchase of the Properties and the construction of two spec houses. To consummate the loan, the Debtor and Werner executed a funding agreement on behalf of Connexian, which contained a truncated loan term and a 11.5% interest rate. Connexian finally completed its purchase of the Properties in September of 2006. The recorded deed of trust in favor of Point Center reflected that Connexian owned the Properties.

Consistent with its charge to raise equity, in August 2006, RSD also introduced the project to the Ivars and coordinated a meeting between the Ivars and the Debtor and Werner. Both the

3

Ivars and Roche, who was acquainted with the Debtor through prior construction projects, soon made investments.

On August 28, 2006, the Ivars made an initial investment of $216,000 in the Coral Blue Project ("Ivars' First Investment"). They contemporaneously executed a Coral Blue, LLC operating agreement dated August 18, 2006 ("Ivars' LLC Agreement"),[2] which purported to give the Ivars 216,000 governance units in Coral Blue, LLC. In pertinent part, the agreement contained the following provision:

> **2.6 BUSINESS AND PURPOSE OF THE LLC.** The purpose of the LLC is to engage in any lawful act or activities for which a limited liability company may be organized under the Statute and specifically the purchasing, developing, selling, and managing four residential properties **identified as Lots 23, 26, 27 and 28,** located in Covenant Hills, Ladera Ranch (such business, including the provision of services with respect to the products of the LLC, is herein referred to as the "Business of the LLC").

("Section 2.6") (second emphasis added).

Apparently, in exchange for their investment, the Ivars received from Connexian an unsecured promissory note in the amount of $216,000. The note matured in one year, required a balloon payment, and carried a 25% annual interest rate.

Separately, on September 12, 2006, Roche completed a $200,000 investment in the Coral Blue Project. He also executed a Coral Blue, LLC operating agreement, this one dated

---

[2] The Ivars also executed a Coral Blue, LLC subscription agreement, which purported to give them 216,000 membership units in the company.

4

September 13, 2006 ("Roche LLC Agreement").[3]

Although dated only 26 days after the Ivars' LLC Agreement, the Roche LLC Agreement contained material differences. They included a completely different schedule of LLC members; the membership list in Roche's agreement contained only himself, the Debtor, and Werner - there was no reference to the Ivars. And, unlike the Ivars' LLC Agreement, the Roche LLC Agreement did not contain the Section 2.6 language; in fact, there was no reference to the Properties at all.

A few months later, the Ivars agreed to further investment in the Coral Blue Project. Apparently, they understood that these funds would be used to develop lots 26 and 27. According to the Ivars, the second investment consisted of two installments: $200,000 in December 2006 and $400,000 in April 2007 (jointly, "Ivars' Second Investment").

In connection with the first installment, the Ivars received a "straight note" from Connexian in the amount of $200,000. Pursuant to broker escrow instructions executed by Alan Ivar and Werner, the $200,000 was also a 30-day loan to Connexian. The "loan" was secured by a deed of trust encumbering lots 26 and 27; the deed of trust, however, was "to be held unrecorded until maturity or satisfaction . . . ."

As to the second installment, Alan Ivar and Werner (on behalf of Connexian) executed an "investment breakdown" worksheet dated April 18, 2007. The worksheet reflected a

---

[3] Like the Ivars, Roche also executed a Coral Blue, LLC subscription agreement, which allegedly gave him 200,000 membership units in the company.

5

proposed rate of interest of 25% to the Ivars, which the Ivars later attested referred to 25% of the profits from the construction of lots 26 and 27.

In August 2007, Connexian obtained a second loan from Point Center, in the amount of $6.5 million dollars. According to Connexian, this loan was intended for the construction on lots 26 and 27. The fall of 2007 then brought hurried efforts to refinance the first Point Center loan. Connexian, however, was ultimately unsuccessful in these efforts, and the first Point Center loan matured without repayment.

Point Center then learned that Connexian had encumbered the Properties with junior liens, in express contravention of the terms of its loans. It notified Connexian that it was in default of the terms of the second loan and that, as a result, Point Center was accelerating the loan balance and required immediate payment of the second loan in full. Connexian could not repay either of the Point Center loans, and Point Center ultimately foreclosed on the Properties. None of the Properties had been fully developed, much less marketed or sold. Connexian ceased doing business in March 2008.

Next, the Ivars and Roche joined forces and commenced an adversary proceeding against the Debtor.[4] The adversary complaint alleged fraud in the inducement and sought to except

---

[4] The Ivars and Roche also commenced an action against the Debtor in California state court, where they obtained a default judgment. That judgment was later vacated, following the Debtor's bankruptcy filing.

their investments from discharge under § 523(a)(2)(A).[5] Following a successful petition for a transfer of venue to the Central District of California, the bankruptcy court consolidated four related adversary proceedings, including the proceeding against the Debtor.[6]

During the one-day trial, counsel for the Ivars and Roche introduced two prior tax returns and the Debtor's statements of financial affairs, as initially filed and twice amended, for the purposes of impeachment. The bankruptcy court admitted the documents as impeachment evidence. It then took the matter under submission.

The bankruptcy court subsequently entered an amended statement of decision. It found that Connexian's purchase of the Properties expressly contravened Section 2.6 of the Coral Blue, LLC operating agreement. And it found the Debtor not credible as a witness, stating that it instead believed the plaintiffs' version of the events. It thereafter entered a judgment in favor of the Ivars for $816,000 (plus post-judgment interest), and Roche for $200,000 (plus post-judgment interest). The Debtor timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C.

---

[5] The adversary complaint also alleged a claim under § 523(a)(4). The bankruptcy court later determined that because it found in favor of the plaintiffs on their § 523(a)(2)(A) claim, there was no need for it to rule on the alternate claim under § 523(a)(4).

[6] The parties to the other proceedings later settled, leaving only the proceeding against the Debtor for trial.

7

§§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

**ISSUES**[7]

1. Whether the bankruptcy court erred in excepting the investments from discharge under § 523(a)(2)(A).

2. Whether the bankruptcy court erred by considering the Debtor's prior tax returns and statements of financial affairs to find that he was not credible as a witness.

**STANDARD OF REVIEW**

In appealing from a nondischargeability determination, we review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009), aff'd, 407 Fed. App'x. 176 (9th Cir. 2010); see also Carrillo v. Su (In re Su), 290 F.3d 1140, 1142 (9th Cir. 2002)("Whether a claim is nondischargeable presents mixed issues of law and fact and is reviewed de novo.").

**DISCUSSION**

Section 523(a)(2)(A) excepts from discharge a debt "for money, property, services, or an extension, renewal, or refinancing of credit" obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition." To prevail on such a claim, a creditor must prove: (1) misrepresentation,

---

[7] On appeal, both parties advance arguments as to the Debtor's alleged omissions of the terms of the first loan with Point Center. In its decision, however, the bankruptcy court made no findings or determination on this theory of fraud. Thus, we do not address those arguments.

8

fraudulent omission or deceptive conduct by the debtor; (2) the debtor's knowledge of the falsity or deceptiveness of his representation or omission; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's representation or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. <u>Ghomeshi v. Sabban (In re Sabban)</u>, 600 F.3d 1219, 1222 (9th Cir. 2010); <u>In re Weinberg</u>, 410 B.R. at 35. The creditor must prove each element by a preponderance of the evidence. <u>Grogan v. Garner</u>, 498 U.S. 279, 284 (1991).

A principal purpose of the Bankruptcy Code is providing the "honest but unfortunate debtor" with a fresh start. <u>Danielson v. Flores (In re Flores)</u>, 735 F.3d 855, 861 (9th Cir. 2013). As a result, the § 523 exceptions to discharge are narrowly interpreted in favor of debtors. <u>Mele v. Mele (In re Mele)</u>, 501 B.R. 357, 363 (9th Cir. BAP 2013).

**A.   As to each investment, the bankruptcy court failed to make adequate findings on each element of § 523(a)(2)(A).**

Civil Rule 52(a) (incorporated into adversary proceedings by Rule 7052) instructs that "[i]n an action tried on the facts without a jury, . . . the court must find the facts specially and state its conclusions of law separately." These findings and conclusions may be stated on the record or in a memorandum decision. The findings must be sufficient to indicate the factual basis for the trial court's ultimate conclusion. <u>Unt v. Aerospace Corp.</u>, 765 F.2d 1440, 1444 (9th Cir. 1985). And, the findings must be sufficiently explicit such that the appellate court has a clear understanding of the basis of the trial

9

court's decision and can determine the grounds on which the trial court reached its decision. <u>Mattel, Inc. v. Walking Mountain Prods.</u>, 353 F.3d 792, 815 (9th Cir. 2003); <u>Unt</u>, 765 F.2d at 1444; <u>Veal v. Am. Home Mortg. Servicing, Inc. (In re Veal)</u>, 450 B.R. 897, 919 (9th Cir. BAP 2011). Even when a bankruptcy court does not make formal findings, however, we may proceed with review "if a complete understanding of the issues may be obtained from the record as a whole or if there can be no genuine dispute about omitted findings." <u>Id.</u> at 919-20.

Here, there were three different investment transactions involving two unrelated parties; the Ivars and Roche learned of one another and joined forces only after they were shorn of their investments. Nonetheless, the bankruptcy court's sparse findings lump the transactions together. This is problematic because the basis for its one clear finding of misrepresentation applied only to the Ivars' First Investment. Also problematic is the complete absence of findings on three of § 523(a)(2)(A)'s required elements.

The bankruptcy court found at least one, but possibly three misrepresentations. First, it found that despite Coral Blue, LLC's "clear purpose" of buying the Properties as set forth in its operating agreement, Coral Blue, LLC did not, in fact, buy the Properties – Connexian did. This, it found, contravened the Section 2.6 language in the Ivars' LLC Agreement. Section 2.6, however, did not actually state that Coral Blue, LLC would hold title to the Properties. And nothing else in the agreement made reference to property ownership.

Significantly more problematic, however, is that Section 2.6 existed only in the Ivars' LLC Agreement. Although both the Roche LLC Agreement and the Ivars' Coral Blue II, LLC Operating Agreement contained a section discussing the business and purpose of the LLC's, only the Section 2.6 in the Ivars' LLC Agreement made any reference to the Properties. Therefore, the emphasized Section 2.6 language relied upon by the bankruptcy court pertained only to the Ivars' First Investment – not to the Roche Investment and not to the Ivars' Second Investment. To the extent it found that this was a misrepresentation as to all three investments, it appears to be clear error.

Unlike the Ivars, however, Roche provided additional evidence on this issue. In his declaration, Roche attested that he was informed that Coral Blue, LLC would purchase the Properties. But, he did not identify who made that representation to him. And his testimony at trial did not touch upon the issue. To the extent that Werner made the representation, the bankruptcy court would need to make the necessary findings as required by this Panel's decision in Sachan v. Huh (In re Huh), 506 B.R. 257 (9th Cir. BAP 2014),[8] so as to impute Werner's alleged misrepresentation (if any) to the Debtor.[9]

_____

[8] In re Huh was filed on March 11, 2014; this was after the adversary trial but before the bankruptcy court issued its amended statement of decision.

[9] There is also ambiguity as to whether the bankruptcy court admitted Werner's declaration into evidence. Insofar as it was admitted, the bankruptcy court did not resolve contrary

(continued...)

11

Second, the bankruptcy court found that the Ivars and Roche were led to believe that the Debtor was an experienced real estate developer, which it determined to be untrue. On this record, however, we are unclear as to whether it found that this was a representation made by the Debtor; it made no findings as to who made the representation to the Ivars and Roche or when. Moreover, the record does not support this finding cleanly; there was no dispute that RSD introduced the Ivars to the Coral Blue Project (and, by extension, the Debtor). And, Roche was already acquainted with the Debtor through prior construction projects.

Third, the bankruptcy court found that, contrary to the loan documents related to Point Center's senior lien, "a junior lien was [created and] recorded against the Properties . . . without Point Center's prior knowledge or consent and constituted a serious breach of the terms of the loan secured by the senior lien on the Properties." Again, we are unclear as to whether the bankruptcy court determined that this was a misrepresentation or omission. Insofar as it did, it is unclear

(...continued)
evidence contained therein; namely, that Werner did not make any representation that Coral Blue, LLC would own the Properties.

The adversary proceeding docket shows that, prior to trial, the Ivars and Roche moved to strike Werner's declaration. There was no ruling on this request prior to trial. But, at the conclusion of trial, it appears that the bankruptcy court admitted into evidence the declarations of witnesses to the extent they contained references to exhibits. The record is unclear as to whether this referred only to the declarations of witnesses who testified at trial. In its decision, the bankruptcy court made no reference one way or another to Werner's declaration.

12

how this related to the investments made by the Ivars and Roche.

The bankruptcy court then broadly found that "the misrepresentations made by [the Debtor] proximately caused Plaintiffs' [losses]." It did not, however, particularly explain its finding. Again, that is a concern here, given the existence of some anomalous facts.

As noted by the bankruptcy court, Connexian held title to the Properties, rather than Coral Blue, LLC. But, the Ivars received promissory notes only from Connexian with respect to their investments. And, in connection with the Second Investment, the Ivars also received a deed of trust from Connexian securing the promissory note. To the extent the pertinent misrepresentation was that Coral Blue, LLC would hold title to the Properties, the existence of these notes and deed of trust bear some relevance on the issue of proximate cause and reliance.

Finally, the bankruptcy court made no findings as to the Debtor's knowledge of falsity and intent to deceive or the plaintiffs' justifiable reliance.

Additional findings are necessary here. That the bankruptcy court found the Debtor not credible and, conversely, accepted the plaintiffs' version of events, did not absolve it of the requirement to make specific findings, particularly in a nondischargeability proceeding and given this record.

**B. The bankruptcy court did not err by considering admissible impeachment evidence to find that the Debtor was not credible as a witness.**

The Debtor also contests the bankruptcy court's reliance on

13

prior tax returns and his statements of financial affairs, as initially filed and twice amended (collectively, the "SOFAs"), in determining that he was not a credible witness. He argues that because these documents constituted statements relating to his financial condition, the bankruptcy court could not rely on them in assessing his credibility as a witness.

We disagree. While it is true that § 523(a)(2)(A) excludes statements respecting a debtor's financial condition, that subsection does not speak to the use of admissible impeachment evidence. Here, the record shows that the bankruptcy court admitted the documents into evidence to impeach the Debtor's credibility as a witness.

At trial, the bankruptcy court permitted counsel for the Ivars and Roche to cross-examine the Debtor as to inconsistencies between prior tax returns and his SOFAs. The Debtor was given the opportunity to explain. And, counsel for the Ivars and Roche expressly offered the documents as impeachment evidence.

Contrary to the Debtor's argument, the bankruptcy court did not rely on the tax returns and SOFAs as the misrepresentations themselves. Instead, it found that the evidence showed that the Debtor was not a successful real estate developer. The bankruptcy court ultimately found that the Debtor was not credible based on the cumulative evidence before it, including the impeachment evidence. We discern no error in this regard.

**CONCLUSION**

We VACATE the judgment and REMAND to the bankruptcy court with instructions to make adequate findings. But, to the extent

14

that the bankruptcy court relied on impeachment evidence respecting the Debtor's financial condition, we AFFIRM.